**James Frank THOMAS and Reba Fern Thomas, Respondents,**

v.

**BOONE ELECTRIC CO-OPERATIVE, a Corporation, Appellant.**

**No. 22198.**

Kansas City Court of Appeals. Missouri.

March 7, 1955.

Ralph L. Alexander, Warren D. Welliver, Alexander, Harris & Welliver, Columbia, Stockard & Stockard, Jefferson City, of counsel, for appellant.

Edwin C. Orr, Columbia, Orr & Sapp, Columbia, of counsel, for respondents.

SPERRY, Commissioner.

Plaintiffs sued defendant for damages caused by the loss of their farm house by fire. From a verdict and judgment in the amount of $4,000, defendant has appealed.

Plaintiffs' theory is that defendant's agent, who inspected the wiring in their house and was paid a fee therefor, found it to be defective but, nevertheless, turned the current into the wiring and left it on; that, as a direct result of the defective

and unsafe condition of the wiring, the house caught fire and was totally destroyed.

The house was located on a farm of 120 acres owned by plaintiffs. It was of frame construction and consisted of 5 rooms and porch. It faced north. At the front there were two downstairs rooms, separated by a hall and, immediately over these rooms there were two upstairs rooms. There was a one-story room, used as a kitchen, immediately south of the west downstairs room. East of the kitchen was a porch. There was an attic over the kitchen but it did not extend over the porch. The porch roof was of shingles and was slightly sloping, but there was no opening between the kitchen attic and the small space between the ceiling and roof of the porch.

Plaintiffs employed a Mr. McKinney and a Mr. Ott to wire their house so that they might be connected with defendant's electric lines. The wiring was completed in early September, 1952, and defendant caused its agent, Rapp, to inspect the wiring for workmanship and materials, to determine whether or not it was safe to turn on the electricity. Mr. Rapp made such an inspection on September 11th, turned on the electricity and left it on. The house burned at about 11:00 a. m., September 25th.

Mrs. Thomas testified to the effect that she was home when Rapp made the inspection; that she assisted him by working the switches; that there was a switch in the kitchen which was for operation of the kitchen light; that there was also a three-way switch on the east wall of the kitchen for operation of the ceiling light on the porch; that when the porch light was turned on it burned very dimly; that Rapp told her that it didn't work right, that it should not be used in its then condition, and told her to notify the electrician who wired the house to come and repair it. She stated that the three-way switch on the east wall of the kitchen was not thereafter used; that when the kitchen lights were switched on, by another switch located on the north wall of the kitchen, the bulb in the kitchen as well as that in the porch would be illuminated, but the porch light would be dim; that Rapp left a pink slip showing thereon the result of the inspection, which was delivered to Mr. McKinney for his information in making the required repairs, but that said repairs were never made.

Mr. Rapp testified to the effect that he inspected the wiring; that the purpose of the inspection was to determine whether or not the wiring was safe to use and conformed to the Underwriter's code in regard to safety from fire hazard; that it took from 15 to 30 minutes to make the inspection; that he used a test bulb in his inspection but did not use a megohmmeter, of which instrument, however, he had some knowledge; that he was vague as to what he did, didn't remember much about the house or its arrangement, and was vague about the condition he found regarding the porch light, but admitted that the switch connected with it did not work properly. He identified plaintiffs' exhibits as follows: 1. Defendant's receipt for plaintiffs' electricity bill of $1.04 and inspection fee of $1.50; 2. The inspection sheet which witness made at the time of the inspection; 3. Defendant's bill to plaintiffs' for the inspection fee. He admitted that he rejected one of the connections in the wiring but the sheet showed rejection of a junction. He said he only inspected one junction and didn't know how many there were in the house. He admitted that he wrote on the sheet that the three-way switch on the east wall of the kitchen (which apparently operates the kitchen light as well as the porch light) was not working properly. He said he only "took down" one switch during his inspection, and that he turned the electricity on in the house and left it on.

Mrs. Thomas further testified to the effect that, early on the morning of September 25, there had been a fire in the kitchen stove; that, at about 11:00 a. m., she smelled smoke; that she investigated and saw smoke coming from around the light fixture in the porch ceiling, over the well; that she called to her son, Delbert; that she threw water up against the ceiling, where the smoke was issuing; that

642

there was no fire visible at that time; that Delbert took two buckets of water upstairs to throw on the porch roof; that, shortly thereafter, fire blazed out around the fixture; and that the house and contents were quickly consumed; that the value of the contents was $1,250.

Delbert stated that he was listening to the radio and smoking, in the front room; that his mother stated that she smelled smoke; that, shortly thereafter, she called to him; that he went into the kitchen and saw smoke coming from around the light fixture in the ceiling of the porch; that there was no blaze or fire visible; that he took two buckets of water upstairs and, from a window overlooking the porch roof, saw smoke issuing from and through the shingles in the area of the light fixture, but saw no fire; that he threw the water over that area and returned to the porch, at which time fire was visible around the light fixture, between the ceiling and the roof, in the area occupied by the rafters; that the house and all contents burned completely.

Mr. Thomas testified to the effect that the porch roof was about one foot high and sloped to where it was "flat"; that there was virtually no space between the ceiling and the roof, except that occupied by rafters, and no opening in the ceiling; that the value of the contents of the house, lost by the fire, was $1,250; that the value of the house and contents was from $4,500 to $5,000 at the time of the fire. He stated that he had examined the flue of the kitchen stove, which was located along the west wall of the kitchen, some five months before the fire occurred and thought it was safe; that someone told him, after the fire occurred, that Mr. McKinney had seen chinks in the chimney while he was wiring the house. Over objection he stated that the fair rental value of the house was $25 to $30 monthly.

Mr. Flannery, Superintendent of North Kansas City Electric Company, who had three years of electrical engineering at college, had wired a great many houses and industrial plants, supervised installa-tion of electrical equipment in two large TV stations and was familiar with electronics installation, gave evidence as an expert in the field of electricity. He stated that it is a recognized practice in inspecting electrical wiring to use a megohmmeter, an instrument which will detect and indicate unsafe conditions in the wiring, junctions, connections and fixtures in a building; that a proper inspection cannot be made by the use of bulbs; that the switches and wiring out to be disassembled and inspected for soldering and insulation before turning on electricity; that if the porch light was burning dimly, and if it burned when the kitchen light was switched on from a switch not directly connected with the porch light, it indicated the existence of an unsafe condition in the wiring; that electricity is a very dangerous substance and is the cause of many deaths and fires; that regulations for installation of wiring, as promulgated by the Underwriters, are designed to minimize fire hazards; that the condition found by Rapp and indicated by the evidence, as to the porch light, was evidence of the existence of a serious defect in the wiring of the house from which a fire might be expected to develop; that, in view of that condition, it was dangerous to turn the electricity on and leave it on; that a fire from such a condition could result within a short space of time, or two weeks later, as in this case.

Plaintiffs offered the testimony of Mr. Hinshaw, who stated that, in his opinion, the value of the house at the time it was burned, was $5,000 to $6,000. Mr. Barner testified to the effect that the value of the house was $3,000 "or a little better."

Defendant offered the testimony of Mr. Ott, who stated that while he and Mr. McKinney were wiring the house they noticed, in the attic, that the kitchen flue was defective; that mortar was missing in places; that sparks could be seen through the chinks; that they called the situation to the attention of Mr. Thomas, telling him that the flue was bad. Mr. McKinney corroborated the above testimony of Mr. Ott.

■ Defendant contends that plaintiffs failed to make a submissible case. It is urged that the evidence fails to disclose that the wiring was dangerous and unsafe. Defendant sent its own agent, Rapp, to inspect plaintiffs' house for the specific and sole purpose of determining whether or not it was safe to turn on the electricity and use it. Regardless of whether he made a sufficient inspection, under all of the circumstances, his own record indicates that a junction and the porch light were defective; and he told Mrs. Thomas not to use the switch on the east wall of the kitchen until the porch light had been repaired. Defendant, therefore, had knowledge, from and after September 11, that the wiring was defective. As to whether it was dangerous and unsafe, defendant knows that it deals in a highly dangerous commodity. It knows that defective wiring creates a dangerous fire hazard. That is the reason it caused the inspection to be made, at plaintiffs' expense, before it would connect their house with electricity. Its agents stated, on the inspection record which was in evidence, that he "found that the wiring did *not* meet the *minimum* standard required by the National Code." (Italics ours.)

In view of the undisputed documentary evidence it would seem that further proof of the dangerous and unsafe condition of the wiring was not required in order for the jury to have believed that fact to have been established to their reasonable satisfaction. However, if further evidence were needed, witness Flannery's testimony was clearly to the effect that the conditions found and reported by Rapp, as well as the fact that the porch light went on when the kitchen switch was operated, indicated that the wiring was in a dangerously unsafe condition, and was likely to cause a fire.

■ Defendant also contends that there is no credible evidence tending to prove that the fire was actually caused by electricity. The undisputed evidence was to the effect that the fire originated around the light fixture on the porch, the very fixture which, the evidence all tends to show, was defective and not safely operable. It was considered by defendant's inspector to be so unsafe that he instructed Mrs. Thomas to not use the switch leading to it until an electrician had repaired it. Mr. Flannery stated that the condition shown to exist indicated a dangerous fire hazard. Mrs. Thomas stated that the switch on the east wall was never used and, indeed, defendant does not contend that it was used. It argues that the fire could not have been caused at that point because of that reason, that no current could reach that point. However, Mrs. Thomas testified to the effect that the porch light ignited when the *other* switch in the kitchen was operated, which is some evidence that current was reaching the porch fixture.

Defendant does not offer any theory of how the fire originated. It offered testimony to the effect that the kitchen flue was in a dangerous condition because mortar had fallen from between the bricks. Assuming that to be true, yet the facts in evidence were that there had been no fire in the kitchen stove since early that morning. Furthermore, the fire did not originate either on the exposed surface of the porch ceiling or the roof, but smoke first issued from a point between the two; and the evidence was to the effect that the stove was located about midway of the kitchen, along the south wall. The flue, therefore, was distant from the porch light fixture the entire width of the kitchen and a part of the width of the porch, with no opening from the attic, through which it passed, and the space between the roof and ceiling of the porch. It is, therefore, difficult to perceive how a spark from the flue could have gotten to the point where the fire was first discovered. But defendant does not say that such a thing did happen; nor does it offer any suggestion as to what caused the fire.

Defendant cited Illinois Power & Light Corporation v. Hurley, 8 Cir., 30 F.2d 905. The facts in that case are entirely dissimilar to those in the case at bar. It is not in point. It also cites Cole v. Empire

District Electric Company, 331 Mo. 824, 55 S.W.2d 434. There the fire, when discovered, was running up the electric wiring, the insulation of which was blazing. It was shown that electric wiring had been installed in an unsafe manner and an expert witness stated that, by reason of the unsafe installation, a fire hazard was created; that a fire would likely occur therefrom. The court ruled, on that evidence, that a submissible case was made. In the case at bar, defendant's inspector found the wiring in an unsafe condition. Mr. Flannery stated that a fire could likely result therefrom. A fire did occur and was first discovered at the defective porch light which the inspector had said was unsafe for use. The Cole decision is authority for our ruling, in this case, that a submissible case was made.

Defendant contends that error was committed in that plaintiffs alleged, and stated in their opening statement, that they sought damages because of the loss of the rental value of the house; and it also urges error because Mr. Thomas testified, over defendant's objection, that the rental value of the house was $25 or $30 per month.

Defendant concedes that evidence of rental value of a building destroyed by fire might, under some circumstances, be admissible in determining market value. With that we agree. See 29 C.J.S., Eminent Domain, § 167, pp. 1038, 1039.

However, the measure of damages, generally, is the fair reasonable market value of the property lost. That is the measure of damages submitted under the instruction in this case, and defendant does not criticise said instruction.

If it be conceded that admission of the criticised evidence, under all of the circumstances, was technically erroneous, yet we cannot say that defendant was prejudiced thereby. All of the evidence was to the effect that the house was of the value of $3,000, *or more*. Mr. and Mrs. Thomas were the sole witnesses as to the nature and value of the contents that were destroyed. They fixed that value at $1,250. The verdict was for $4,000, less than the lowest value placed on the property.

Since we cannot say that error was committed affecting the merits of the case, the judgment should be affirmed.

BOUR, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed.

All concur.