**STATE of Missouri (Plaintiff), Respondent,**

v.

**Thomas Jesse BROWN (Defendant), Appellant.**

**No. 45306.**

Supreme Court of Missouri.

Division No. 1.

May 14, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied June 11, 1956.

Shaw & Smith, Clayton, for appellant.

John M. Dalton, Atty. Gen., David Donnelly, Sp. Asst. Atty. Gen., for respondent.

VAN OSDOL, Commissioner.

Defendant Thomas Jesse Brown was charged, jointly with one Carl Benton Drake, with burglary in the second degree. Section 560.070 RSMo 1949, V.A.M.S. A severance was granted, and defendant, tried separately, was convicted and his punishment assessed at two years in the State penitentiary. He has appealed from the ensuing judgment.

Defendant-appellant contends (1) that his arrest was illegal and the subsequent search and the seizure of certain articles, crowbars and screw drivers which the State introduced into evidence as the instruments used in effecting the burglary, were unreasonable and unlawful and in violation of constitutional guaranties, Art. I, § 15, Const. V.A.M.S., and the trial court erred in denying his motion to suppress such evidence; (2) that the trial court erred in permitting a witness to express an opinion that the marks on certain exhibits were or could have been made by the crowbars and screw drivers which had been seized by the officers—it is said that the opinion evidence invaded the province of the jury and was erroneously admitted in relation to a subject upon which expert testimony was not required; and (3) that the trial court erred in overruling defendant's motion for a judgment of acquittal at the conclusion of all the evidence. It is argued that the State's case rested entirely on circumstantial evidence, and the evidence introduced was as consistent with innocence as with guilt.

Preliminary to the consideration of defendant-appellant's contentions, it is necessary to make a general statement of the evidence.

There was evidence introduced tending to show that one Marguerite Dallmeyer is the proprietor of a business conducted at the "Boathouse" located on the west side of Highway No. 94 in Boschertown, St. Charles County. The Boathouse, a store, is operated by Marguerite's husband, Helmuth. The Boathouse building is a one-story structure with attic and basement. The main floor is on the ground (highway) level. On this floor the Dallmeyers conduct a retail store with merchandise consisting of motor boats, motors, marine supplies, hardware and fishing tackle. To the rear, the grade declines abruptly, and the basement fronts westwardly on a level approximately eleven feet below the main floor of the building. At the rear of the basement is a folding garage door which, when unused, is kept locked and barred. The building is also protected by a burglar alarm. The mechanism of the alarm is so connected that a window may be broken or a door opened without tripping the alarm—one must be inside and at a distance of several feet from the exterior walls to trip the alarm mechanism. The doors of the Boathouse had been locked and barred and the alarm device had been set by an employee of the Dallmeyers when he left the building between seven and seven-thirty in the evening of April 3, 1950.

An arrangement had been made between the Dallmeyers and one Hobart Halbruegge, a merchant who operates a store a short distance away across the highway, that should he, Halbruegge, hear the burglar alarm he was to notify the Dallmeyers.

At approximately 1:15 in the morning of April 4th, Halbruegge was wakened by the sound of the burglar alarm, and Helmuth Dallmeyer was notified by telephone. Helmuth called the police of the city of St. Charles and reported the alarm was sounding. He also went to the Boathouse. There he observed the door of the basement was ajar, and the lock and tubular iron bar of the basement door had been torn from their hangings. He saw that the basement door and the basement door frame had marks on them which he had not seen before (and the next day he also observed marks on a window, and on the lower sash and the lower part of a window frame).

The police department of St. Charles, upon notification of the circumstance that the burglar alarm was sounding, dispatched police officers to investigate. The officers took a position on a driveway in the north part of St. Charles with their patrol car facing Highway No. 94 at a point from which they could observe traffic traveling southwardly on the highway. In a few minutes, they heard a motor vehicle approaching from the north. The vehicle was moving at a high rate of speed. The vehicle's lights were turned off, but were turned on when the vehicle was "within a block and a half of the (St. Charles) city limits." The vehicle was a green Chevrolet pickup truck. The officers stopped the truck and placed the driver, defendant, under arrest for investigation in connection with burglary in Boschertown. They also arrested Carl Benton Drake who was seated on the right in the truck cab.

After the arrest of defendant and Drake, the officers took possession of crowbars and screw drivers and other described articles which were lying on the floor of the cab of the truck. The officers took the crowbars and screw drivers to the Boathouse to ascertain if they fitted into the marks on the window, window sash and the door of the basement of the Boathouse building. Some of them did.

The crowbars and screw drivers were introduced into evidence, having been designated as exhibits in series, Nos. Q–1 to 7. Some pieces of wood, wooden splinters, a window sash, and a bolt or lag screw, parts of the windows and door of the basement, were also introduced into evidence. These exhibits were designated as exhibits in series, Nos. K–1 to 6.

The Chevrolet truck belonged to William Landherr, Drake's employer, a contractor doing business advertised as "Reliable Home Repairs." The crowbars and screw drivers were identified by Landherr as belonging to him. He referred to the bars as "wrecking bars." Landherr testified that it was not unusual for his employee Drake to take the truck home and keep it overnight. The truck was quite commonly used by Landherr's employees.

Defendant, an excavating contractor, testified in his own behalf. He said he had been interested in buying a "high lift," a machine used in refilling excavations for sewers or drains. He knew of one of these machines which was located "right (east) across the bridge." He had been told the owner of the machine lived "right out of St. Charles" and the owner's name would be on a mailbox. Carl Benton Drake came to defendant's home the evening of April 3d. Defendant asked Drake, who was driving the light Chevrolet truck, "if he could drive me out there in the truck." They completed their inspection of the high lift "between eleven and eleven-thirty." They then came west across the bridge, made a right turn and looked at the mailboxes endeavoring to locate the mailbox bearing the name of the owner of the high lift. They "went down I would say four or five blocks." They saw "two or three" mailboxes; "we didn't find this name and then we turned around on the highway and we started back and as we just entered town the officers stopped us."

Some of the evidence will be more particularly stated in the course of the opinion.

■ (1) We have noted that the officers of St. Charles were investigating the sounding of the burglar alarm at the Boathouse. They had no warrant for the arrest of defendant, but they were acting on orders to investigate a report which supported the probability that a felony, burglary, had

been committed at the Boathouse. They arrested defendant and Drake, who came from the area where the Boathouse is located a few minutes after the alarm at the Boathouse began sounding. Defendant and Drake were in a motor vehicle driven at a high rate of speed with the lights turned off. The lights were turned on only upon the near approach to the St. Charles city limits. There were reasonable grounds for suspicion that a person (or persons) in the vehicle was implicated in a burglary at the Boathouse.

There was no illegal arrest. The officers, police of St. Charles, are recognized as officers empowered to make arrests for State crimes. Although they have no warrant, they are justified in making an arrest upon reasonable cause (either on their own knowledge of the facts, or on facts communicated to them by others) to suspect the one apprehended is guilty of a felony. State v. Evans, 161 Mo. 95, 61 S.W. 590; State v. Nolan, 354 Mo. 980, 192 S.W. 2d 1016; State v. Johnson, 362 Mo. 833, 245 S.W.2d 43. In this case, there having been reasonable grounds for making the arrest, the officers had the right to search the truck and seize for use in evidence articles which tended to incriminate defendant. State v. Jonas, Mo.Sup., 260 S.W.2d 3. Our case is unlike State v. Cuezze, Mo.Sup., 249 S.W. 2d 373, cited by defendant-appellant. There the arrest was on mere suspicion. The officers in that case had been directed to investigate three men who were in an automobile believed to be a Pontiac sedan. Defendants, Cuezze and DeLuna, and one Trombino, were in a Chevrolet. The officers arrested defendants, and Trombino, on mere suspicion that they were about to commit a felony, not of having committed one. The arrest was unlawful.

We hold that the trial court correctly overruled defendant's motion to suppress.

(2) Defendant-appellant's contention of error in the admission of opinion evidence is directed to a question calling for an opinion of the witness Clemens R. Maise, an associate director of the laboratories of the Police Department of St. Louis since 1947.

Formerly, and for several years, Maise had been employed by the Federal Bureau of Investigation as an analytical chemist. He has the degrees of Bachelor and Master of Science, having specialized in chemistry, and is a member of associations composed of those who are employed by police departments to examine and evaluate evidence. As a hobby, he does amateur carpentry work for about an hour each evening. In his work with the St. Louis Police Department and with the FBI, he has had occasion to observe crowbars, both new and used, "in connection with fitting the marks made by those instruments into marks on wooden or other hard materials." Maise had been given the task of examining and comparing the "Q" and "K" series of exhibits. His examination was visual. He testified that both the "hook end or the nail puller" and the "blade end" of one of the crowbars, Exhibit Q-2, fitted into marks on the Exhibit K-1. Another of the "Q" series of exhibits also matched the markings on Exhibit K-1. Paint which had adhered to certain of the "Q" exhibits was comparable in color to the paint on the lag screw or bolt and chip from the basement door. The paint which had adhered to the "Q" exhibits was not of sufficient quantity to chemically analyze and compare.

The witness Maise was asked and made answer to a question, as follows,

"Q. Mr. Maise, in the light of that, of the examination and comparison that you made and the findings as a result of your examination, would you be able to state whether or not in your opinion, those marks on the 'K' exhibits, which you have testified to here were made by the 'Q' exhibits, which you have testified about? * * * A. My answer is: The marks on that window, designated as Specimen K-1, and on this piece of wood, designated as Specimen K-2, were either made by the tools that I indicated or other tools of identical sized and shaped blades."

Defendant's counsel had objected on the grounds that, though the witness is a chemist and eminently qualified as such, none of his testimony was based on a qualitative or

quantitative analysis; that the observations of the witness have been no more than the observations of any layman; and that the testimony of the witness was based upon mere visual observation which is no better than the visual observation by the jury.

■■ Defendant-appellant argues that the witness Maise, although learned in the science of chemistry, had not made chemical analyses of the exhibits, and was not qualified by any special experience with tools such as crowbars and screw drivers and had little or no experience in working with wood. It is further argued that the witness was erroneously permitted to express an opinion upon a question directly in issue and thus to invade the province of the jury. But we have the view that the factual inquiry pertains to a subject upon which a jury might be aided by the opinion of a skilled witness in arriving at a conclusion on the question whether the markings on the wood were due to the use of the described tools. No doubt the angle at which a tool was held; whether in its use the tool had twisted or had been held firmly in prying; and the texture of the wood fibers, as well as other physical factors could affect the aspect of the markings in ways discernible only by painstaking examination and difficult of minute description; and it would seem that Maise, a trained observer with experience in comparing tools and their markings and in the pursuit of amateur carpentry, was qualified to take these possible factors into account in observing and comparing the peculiarities of the tools and markings and to have an opinion which would be of assistance to the average juror in deciding the factual issue. At least we believe, in the circumstances of this case, the trial court acted within its sound discretion in overruling the objection to the question.

■ Of course, the answer of the witness amounted to no more than that the "Q" exhibits could have made the marks on the "K" exhibits. But whatever the answer, the opinion could not have invaded the province or usurped the function of the jury. A jury may think an opinion has no value. It was the province of the jury to hear and weigh all of the evidence, including opinion evidence, and to decide the issues of fact. Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122. It is true that thus far it is our rule in a will contest, where the issue is testamentary capacity, that the questions whether the testator had sufficient mentality to realize the nature of the transaction of making the will, and to know the nature and extent of his property, and those who are the natural objects of his bounty are not the subjects of opinion evidence (Rothwell v. Love, Mo. Sup., 241 S.W.2d 893, cited by defendant-respondent), although opinion evidence may be introduced as to soundness or unsoundness of mind. And there are other cases in which opinion evidence may be admissible in sustaining or refuting underlying factual issues, yet in these cases opinion evidence may not be admissible as to the ultimate issue. Most ultimate issues carry the incidence of the application of legal principles. For example, in an action for personal injury, an expert might be permitted to state his opinion that trauma experienced by plaintiff caused plaintiff's injury, but we suppose the ultimate question of defendant's liability should not be the subject of opinion evidence. As this court has noted in the Eickmann case, opinions are often admissible upon vital issues which only the trier of the fact may decide; for examples, the causation and permanency of injuries. And it is not too much to say that many cases could be cited where skilled witnesses have been permitted to give their opinions to juries on cause-and-effect issues where, because of the witnesses' peculiar knowledge or experience, their opinions were thought to be helpful to the triers of fact. See Vol. VII, Wigmore on Evidence, 3d Ed., § 1976, p. 121, and cases collated in note 1 pp. 121–133.

■ (3) Where the evidence of a defendant's participation in the burglary is circumstantial, the facts and circumstances relied upon by the State to establish guilt must not only be consistent with each other, and with the hypothesis of defendant's guilt, but they must also be inconsistent and

irreconcilable with his innocence, and must point so clearly and satisfactorily to guilt as to exclude every reasonable hypothesis of innocence. In ruling the sufficiency of the evidence to support a verdict of guilty, however, even where the evidence is wholly circumstantial, all of the evidence tending to support the verdict must be considered as true, and every legitimate inference therefrom favorable to the verdict must be indulged. State v. Murphy, 356 Mo. 110, 201 S.W.2d 280, and cases therein cited; State v. Hampton, Mo.Sup., 275 S.W.2d 356.

So far as the evidence shows, all of the "Q" exhibits were tools such as one might buy at most any hardware store and were in the condition as when they were made, save and except Exhibit Q-2, the ends of which were peculiar in shape due to grinding. There was verbal and demonstrative evidence that the peculiarly shaped ends of Exhibit Q-2 matched the markings on the window sash (Exhibit K-1). The witness Maise testified that he was of the opinion the crowbar, Exhibit Q-2, had "been ground on an emery wheel and it was not in that condition when it was new." In this connection, Landherr, owner of the truck and of the "Q" exhibits, a witness for defendant, testified that he had "ground this tip here" of the Exhibit Q-2, "and this little turned-up affair on there is quite distinguishable." Frank Dapron, deputy sheriff of St. Charles County, testified that, using a magnifying glass, he had compared the crowbar (Q-2) with the markings on the window sash (K-1) and fitted the tool into the markings. He demonstrated to the jury the manner of his comparison, and that both ends of the tool, which had been modified by grinding as stated, matched the markings on Exhibit K-1, the window sash.

The circumstance of the presence of defendant in the general area of the Boathouse at the time the burglary was committed; the circumstance of his hasty departure from the area with vehicular lights switched off; the fact that he, when testifying, did not fully or satisfactorily account for his whereabouts during the hour and a half or more between the time he said he inspected the high lift and the time he was apprehended by the officers; the circumstance of the presence of the described tools (the "Q" exhibits) in the vehicle he was driving; and the circumstance that certain of the tools fitted the markings on the fragments of wood, the window sash, and the bolt and chip taken from the basement door—all are consistent with each other and with an hypothesis of defendant's guilt. Now there is the additional fact, as stated, that one of the tools which matched the imprints on the wooden parts of the burglarized building was quite distinguishable in shape. We believe this fact or circumstance, considered in conjunction with the other circumstances stated, is inconsistent with any reasonable theory of innocence of defendant.

As we have said, the evidence tending to support the verdict must be considered as true. Giving full credence, therefore, to the evidence tending to show the circumstances stated, we are of the opinion the evidence supported the reasonable inference of defendant's guilt, and was substantial circumstantial evidence supporting the verdict.

We hold that the trial court did not err in overruling defendant's motion for a judgment of acquittal.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.