STATE of Missouri, Respondent,

v.

Albert PAGLINO, Appellant.

No. 46219.

Supreme Court of Missouri,

Division No. 2.

Dec. 8, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 12, 1959.

Charles M. Shaw, Clayton, and Wayne C. Smith, Jr., St. Louis, for appellant.

John M. Dalton, Atty. Gen., John W. Inglish, Asst. Atty. Gen., for respondent.

STOCKARD, Commissioner.

Albert Paglino was found guilty of a homicide in the perpetration of arson, declared to be first degree murder, Section 559.010 RSMo 1949, V.A.M.S., and the jury assessed his punishment at life imprisonment. See Section 559.030 RSMo 1949, V.A.M.S. He has appealed from the ensuing judgment. This is the second appeal in this case. See State v. Paglino, Mo.Sup., 291 S.W.2d 850.

The first contention on this appeal is that the trial court erred in overruling appellant's motion for a directed verdict of acquittal. Therefore, we shall set out in detail the evidence presented on behalf of the state.

On April 4, 1954, at 11:09 p. m., appellant registered at the Warwick Hotel in downtown St. Louis using the assumed name of Albert C. Lewis. There was no evidence that he actually stayed at this hotel after registering in and until he checked out at 3:23 a. m. on April 10 under circumstances to be mentioned later. About midnight on April 5, appellant appeared at the St. Louis Tourist Court, a motel on U. S. Highway 66 in St. Louis County, and registered as a guest using his correct name. He listed on the registration card the make and license number of his 1950 Nash automobile. The manager of the motel, Mr. Stark, took appellant to cabin 5, turned on the lights and showed the cabin to him. There was no one there, and the cabin had not been used for "quite a few nights." Mr. Stark did not see anyone other than appellant in his automobile.

Cabin 5 was part of a "duplex." The other part was designated as cabin 4 and was occupied by Mr. and Mrs. Willard Boyd from Spiral, Oklahoma. The building was about seventeen years old, it was constructed of pine lumber, and it had a tar paper roof and exterior walls of "imitation brick" which was a form of tar paper. Cabin 5 had a butane gas heater,

and sometime after appellant registered and before Mr. Stark went to bed about one o'clock in the morning, Mr. Stark turned off the central control valve which shut off the supply of butane gas to cabin 5. About 1:45 o'clock James F. Baumgardner, while driving westward on Highway 66, saw ahead of him a "sudden burst of flames," he "just saw it all of a sudden, like an explosion or something," and when he drove to the tourist court he saw that cabin 5 was on fire. The windows and doors were not open, there was a "vast amount of flames" and the building was burning very rapidly. Mr. Baumgardner awakened Mr. Stark who called the fire department. The firemen arrived in about ten minutes and it took about twenty minutes to put out the fire and another ten or fifteen minutes "to knock all the ashes down."

After the fire was extinguished the unidentifiable and charred remains of a man was found lying on the floor of cabin 5 near the door. Appellant's automobile was parked near the cabin, and since the body was found in the cabin which had been assigned to appellant, it was assumed that he was the one who had perished in the fire. Appellant's father and brother caused a funeral to be conducted on April 9 and what was then believed to be appellant's remains were buried in Resurrection Cemetery.

James A. McCormick was an attendant at a Clark's Super Gas station at 4300 South Kingshighway, and appellant had worked with him when employed there in 1952 under the assumed name of Albert Lewis. McCormick and appellant were good friends, and McCormick served as a pallbearer at the funeral held on April 9 for appellant. On Friday, April 2, appellant went to the Clark station where McCormick worked and purchased gasoline for his automobile. He apparently handled the gasoline pump himself, and he also filled with gasoline a five-gallon can which was located in the trunk of his automobile. Appellant stated to McCormick that he was going to the Hampton Radio Shop. Apparently this was the last time McCormick saw appellant until between twelve and one o'clock of the morning of April 10 when appellant called him on the telephone and identified himself as "Al," and after inquiring if he were alone said "I'll be up." McCormick thought "somebody was faking," but after awhile he saw and recognized appellant in a parking area at the rear of the station. McCormick went to him and said "I thank God I see you alive again." Appellant replied, "I'm proud to be here. I have a fantastic story. I don't know whether it will hold or not, but I hope so." Appellant then related to McCormick that on the night he went to the Hampton Radio Shop, which was April 2, he went to a White Castle for a cup of coffee and saw "two fellows" on a corner hitchhiking and he decided to pick them up and take them out as far as the city limits. However, when he got to the city limits one of the men drew a gun on him and forced him to drive to some place in Oklahoma where they stopped for gasoline and then on to Amarillo, Texas. There he was forced out of his automobile, but he was permitted to get his suitcase from the automobile. He went to the police and told them his story but they would not believe him and he hitchhiked back to St. Louis. He told McCormick that he had read in the Springfield, Missouri, newspaper about the funeral being held for him. According to this story, appellant left St. Louis the evening of April 2 and did not return until the evening of April 9.

When appellant went to the Clark station on the morning of April 10, he was "very dirty" and needed a shave. He said that his clothes were at the Warwick Hotel, and McCormick took appellant there to get them. It was apparently at this time that appellant checked out of the hotel. They then went to McCormick's home on South 18th Street, and McCormick's wife made some coffee and they talked until

four o'clock in the morning and then went to bed. That night appellant made no effort to get in touch with any member of his family, although he knew that his family believed him to be dead. The "following day" appellant asked McCormick to try to get in touch with his wife, and McCormick called the mother of appellant's wife and learned that she was visiting friends in Illinois. At appellant's request McCormick and his wife drove to Illinois and brought Mrs. Paglino back to St. Louis. Appellant and his wife then stayed at McCormick's home until the following Tuesday or Wednesday which would have been April 13 or 14.

There is no further accounting of appellant's activities until about eleven o'clock on the night of April 15 when he was arrested as he walked toward his automobile, the 1950 Nash, which was then parked across from his father's home in the 5200 block of Vernon Avenue in St. Louis. There is no showing how or when the police officials learned that appellant was still alive, but apparently the fact was known or suspicioned earlier than the actual arrest because the sheriff's office had a "stakeout" at the automobile.

On April 16, the day following appellant's arrest, the Affton fire marshal and a deputy sheriff "went through" the ashes of cabin 5 at the St. Louis Tourist Court and found a badly burned billfold in which there was a social security card bearing the name of Willie Burchett and photographs of a boy and girl identified as Burchett's niece and nephew. The state's evidence clearly justified a finding, and appellant does not assert otherwise, that the body found in the cabin after the fire was that of Willie Burchett. However, there was no evidence of how or under what circumstances he happened to be in the cabin rented to appellant, and there was no evidence that Willie Burchett was ever seen alive by anyone in St. Louis, or that he and appellant were acquainted.

On April 6, 1954 Dr. John Pfaff, a pathologist, examined the then unidentified charred body found on the floor of cabin 5, but he made no attempt to identify it, and from the description he gave of its horribly burned condition identification from it alone would indeed have been miraculous. He testified that in his opinion a fire resulting from the burning of the building without the aid of some inflammable substance "could" cause such burning of a body "but it would be unlikely." A blood test revealed ".41 grams percent of ethel alcohol" which indicated intoxication to "a major degree" and that the person was "approaching unconsciousness if not comatose." On April 16, the body was exhumed and Dr. John P. Wyatt, also a pathologist, performed an autopsy. An examination of blood samples revealed "80.2 per cent carbon monoxide saturation," and Dr. Wyatt stated that this "level" of carbon monoxide was a "lethel or fatal concentration." Because of "cherry red" coloration caused by carbon monoxide within the muscles and blood and because carbon particles were found in the windpipe and the back of the throat, it was the opinion of the pathologists that "respiration had occurred" after the fire started and that Burchett was alive at that time. It was also the opinion of the pathologists that the cause of death was the concentration of carbon monoxide resulting from the fire and from the severe thermal (burning) injury received in the fire.

Appellant's automobile and the can of gasoline necessarily play an important part in the chain of events. McCormick testified that on April 2 when appellant obtained the gasoline at the Clark service station he was driving a 1950 Nash automobile. Presumably this would have been the automobile that appellant was driving when a short time later two men, according to the story he told McCormick, forced him to drive to Texas and then took the automobile from him. However, appellant unquestionably had the automobile when he registered at the motel, and after the fire it was parked near cabin 5. A deputy sheriff tried to open the automobile but

the doors and the trunk were locked, and it was caused to be towed to Briggs' garage on Sappington Road. Donald Cronk, another deputy sheriff who was also at the fire, went to Briggs between nine and eleven o'clock of the morning of April 6, and while he was there someone opened the trunk of the automobile and he saw therein a gasoline can. Later that day Robert Reck, who at the trial identified himself as appellant's "ex-brother-in-law," and his father went to Briggs and by use of the keys opened the automobile and examined the contents of the trunk. He there saw, among other things, a gasoline can. Mr. Reck requested that the automobile be delivered to him, but Briggs refused because "only the wife is allowed to take the car." However, Mr. Reck testified that "we" did get the automobile the following Sunday and that it was taken to his home on Broadway street and parked on a lot next door where it sat for a "couple days." He also stated that appellant got the automobile the day "they were picked up." There is no other evidence concerning the whereabouts of this automobile until the night of April 15 when the police arrested appellant as he approached it while parked across the street from his father's house on Vernon Street. At that time a deputy sheriff took possession of the automobile, and in the trunk there was found a gasoline can which contained about one-third of a quart of premium gasoline.

From the facts previously related it is apparent that for several days following the fire the police officers had no reason to suspect foul play. That undoubtedly accounts for the failure to make an immediate investigation in an effort to determine the cause of the fire. All of those persons present at the fire who testified stated that they detected no odors or fumes. By this they undoubtedly meant that there were no odors of fumes of gasoline, butane or other such material, because there unquestionably had to be odors and fumes from the burning wood and other materials of which the building was constructed. The fire chief of the Affton Fire District testified that he did not see or hear any explosion, as did all the others who were asked this question. But, the fire was well advanced and burning through the roof of the cabin before the firemen arrived, and although Mr. Baumgardner was the first person to see the fire and appear on the scene, the cabin was "entirely in flames" when he arrived and there were "too much flames" to get near it. Mrs. Boyd, who with her husband occupied cabin 4, stated that about five minutes before she heard the alarm of "fire," she heard a noise in cabin 5 which sounded as though a suitcase was dropped, and she also heard the sound of someone walking.

The building was badly burned, and after the fire was extinguished the firemen knocked down a portion of a wall, apparently to remove a hazard. The floor of the cabin had been covered with linoleum. At a place near the door, and at the place where the body of Willie Burchett was found, the fire had burned completely through the linoleum and the wooden floor, and had also caused severe burning of the joists directly below as evidenced by deep cracks in the wood which was referred to by the witnesses as "alligatoring." However, in other parts of the cabin, and only a short distance away, the floor was not severely burned, and the linoleum was not even destroyed.

The state offered the testimony of Mr. Thomas Moran, Detective Captain of the Secret Service Division of the St. Louis Police Department in charge of the bombing and arson squad, and of Mr. Lamont Heidinger, special agent for the National Board of Fire Underwriters. Both of these witnesses were unquestionably qualified by reason of study and experience as experts in the field of determining the cause of fires. Appellant objected to a hypothetical question submitted to each, a matter to be discussed subsequently, but they gave other testimony to which no objection was made, and in view of our

subsequent ruling in regard to the hypothetical questions, we shall set forth here the substance of their entire testimony. Mr. Moran stated that in his opinion the fire in cabin 5 "did not originate in a normal manner and was of incendiary origin," and that by incendiary origin he meant that "the progress of the fire was expedited by the aid of some inflammable substance and had been deliberately set." He also stated that "those joists [as pictured in a photograph] show very deep alligatoring, indicating that there had been extensive, deep burning at that particular point," and that the "intense burning that is indicated in this picture indicates that there had been some inflammable substance in this particular spot." Mr. Heidinger testified that "The burning * * * could not have been caused by the materials of which the building was constructed or the contents. The intense and complete destruction of the floor in one small area while the linoleum immediately around it was not burned indicates that there burned in that completely burned out area some highly inflammable substance or liquid," and that alcohol or gasoline or naphtha could be considered a highly inflammable liquid which could cause such damage. He also stated that the damage to the building was "very concentrated, which indicates that something highly inflammable was concentrated [there] for a period of time. It would take a highly inflammable liquid which would stay in a low spot to burn for a considerable time to burn through as shown in Exhibit 4 [a picture showing the burned out portion of the floor] without burning the floor next to it." Both expert witnesses expressed the opinion that the fire could not have been caused by escaping butane gas and they went into detail in explaining their reasons for that opinion.

The state also presented testimony of appellant's financial and domestic problems as evidence of a motive for an attempt by him to establish his ostensible death. Appellant had been divorced by his first wife, Betty Ann, in 1950, and she had been awarded a judgment for child support which by 1954 had accumulated to more than $3,000. In January 1954 a garnishment proceeding in behalf of Betty Ann against appellant's employer netted only a little more than $30. On March 30, 1954, appellant was found guilty in the St. Louis Court of Criminal Correction of "Failure to Support Children" and sentenced to "one year in the workhouse" but was then paroled on condition that he "pay through the Parole Office the sum of $20.00 per week." He was to make the first payment within two weeks thereafter. The state also showed that on April 6, 1954, appellant was indebted to the Meat Cutters Credit Union in the amount of $320, to Lammert Furniture Company in the amount of $319.15, and to the World Investment Company for approximately $290. His Nash automobile was security for the last mentioned indebtedness.

In connection with the use of the assumed name "Albert Lewis," Deputy Sheriff Bresnahan testified that when he was questioning appellant following his arrest on April 15, appellant told him that "his first wife was always garnishing his wages under the name Paglino—that is why he changed his name to Lewis." A handwriting expert testified that he had examined the various documents admitted in evidence which contained what purported to be the signature of Albert Paglino and Albert Lewis and they were all written by the same individual.

Following the arrest of appellant on April 15, 1954, he was released on bond pending trial, which was set for October 18, 1954. On September 11 appellant, using the assumed name of Frank Reck (the maiden name of his second wife), purchased two black suits of clothes at the Bentley Clothing Company in St. Louis, and he stated to the clerk that he had a brother who was a priest and was sending the suits to him. On September 15 a 1941 Plymouth automobile was found submerged in the Mississippi River at the foot of Carr Street. In this automobile there was found a billfold containing, among other things, an operator's license issued to

Albert Paglino. On October 18 appellant did not appear for trial, a bond forfeiture was ordered, and a capias issued for his arrest. In February 1955, the sheriff of St. Louis County went to El Centro, California and returned appellant to Missouri after he signed a waiver of extradition. Appellant was being held in custody by a California sheriff under the name of Frank Beck, and he told the Missouri sheriff that he had never been in St. Louis County. In appellant's hotel room in California was one of the suits of clothing he had purchased at Bentleys. It also appears that appellant had a wife in California, but it is not established whether this was the same person who was otherwise identified as his second wife and the one who was brought to Missouri from Illinois by McCormick.

Appellant did not testify, but he presented testimony that an examination of the billfold found in the ashes of cabin 5 contained no evidence of gasoline or kerosene, and he also presented the testimony of an expert witness to the effect that from the available facts it could not be determined that the fire in cabin 5 was incendiary in origin.

■ Appellant's contention that he was entitled to a directed verdict of acquittal is twofold. He first contends that "there is no competent evidence from which it could be found that the fire was of incendiary origin or that defendant was the criminal agency causing the fire," and second, that the evidence at this trial was "substantially the same" as that produced at the former trial, and that the ruling in State v. Paglino, Mo.Sup., 291 S.W.2d 850, that a submissible case was not made is the law of the case on this second trial. In the discussion of the merits of the first contention we will show that in this second trial there was introduced new and material evidence, in addition to that introduced at the first trial, on the issues of the incendiary nature of the fire and appellant's criminal agency therefor. For this reason we need not give further attention to appellant's second contention.

■ The evidence unquestionably is sufficient to establish motive and opportunity on the part of appellant to set fire to the cabin and that the death of Willie Burchett resulted from that fire. However, in a prosecution for murder on the basis that a homicide was committed in the perpetration of an arson, it is necessary that in addition to the proof of opportunity on the part of the accused to set the fire and that a fire occurred, " 'There must be proof of circumstances from which the jury will be authorized to find the further fact that such fire was of incendiary origin * * * [and] that the accused was the incendiary.' " State v. Pierson, 343 Mo. 841, 123 S.W.2d 149, 155. Both the incendiary origin of the fire and the guilty agency of the accused may be established by circumstantial evidence, State v. Berkowitz, 325 Mo. 519, 29 S.W.2d 150, 152; State v. Pierson, supra, and whether or not there is the required proof of such circumstances is the precise issue presented.

■■ While in other respects the evidence in the first trial was substantially the same as in this trial, there was no evidence in the first trial that appellant obtained the five-gallon can of gasoline at the Clark service station, and that subsequent to the fire the gasoline can, with only a small amount of gasoline remaining, was found in the trunk of his automobile. Also, there did not appear in the first trial the evidence we have previously outlined which indicated, and supported the opinion of experts, that there was present some highly inflammable substance, such as gasoline, at the place in the cabin where the hole was burned through the floor and where the body of Willie Burchett was found. The rule that "there must be evidence tending to prove that the fire which caused the death of the person charged to have been murdered was of incendiary origin," State v. Meadows, 330 Mo. 1020, 1025, 51 S.W.2d 1033, 1036, means that "there must be some evidence, direct or circumstantial, that the person charged

intentionally started or set the property on fire." State v. Paglino, supra, 291 S.W. 2d at page 857. The evidence on this question, although it consists only of either circumstantial evidence or the opinion of qualified experts, clearly is sufficient to support a finding that the fire and the damage to the building was caused by the presence of some highly inflammable substance, such as gasoline, and the evidence, although entirely circumstantial, is also sufficient to support a finding that appellant was responsible for that fire.

Where the state, as it must necessarily do in this case, relies upon circumstantial evidence to establish the guilt of the accused, the facts and circumstances relied upon by the state must not only be consistent with each other and with the hypothesis of accused's guilt, but must also be inconsistent with his innocence and point so clearly and satisfactorily to guilt to exclude every reasonable hypothesis of innocence. State v. Whitaker, Mo.Sup., 275 S.W.2d 316, 320; State v. Brown, Mo. Sup., 291 S.W.2d 615, 619. The circumstances disclosed by the evidence adduced by the state as above set out, are completely consistent with each other and with the hypothesis of appellant's guilt. In addition, when considered together these circumstances are completely inconsistent with his innocence, and we are convinced that they so clearly and satisfactorily point to the guilt of appellant that they exclude every reasonable hypothesis of his innocence. For this reason, although the state necessarily relied upon circumstantial evidence, the trial court did not err in refusing to direct a verdict of acquittal.

Appellant next contends that the trial court erred in permitting Mr. Moran and Mr. Heidinger "to examine a photograph, together with other circumstances in the case, and to then express an opinion that this fire was aided by some inflammable substance and that the fire was deliberately set," because said opinion is as to an ultimate fact and invades the province of the jury, and it has no factual foundation in the evidence and is based on speculation and conjecture.

The opinions expressed by the two expert witnesses were different. After hypothesizing numerous facts shown by the evidence, the prosecuting attorney was permitted to ask Mr. Moran if he had an opinion whether this fire originated in an "accidental and incendiary manner." These terms are inconsistent. However, appellant entered no objection on that ground but objected because "it calls for an opinion as to the legal conclusion which the jury is to determine." During the discussion appellant also interposed objections that it called for an "opinion as to the ultimate fact" and invaded the province of the jury.

Mr. Moran was permitted to answer, and he stated that "My opinion is that it [the fire] did not originate in a normal manner and was of incendiary origin." In reply to a subsequent question he stated, without objection, that by the use of the term "incendiary origin" he meant "that the progress of the fire was expedited by the aid of some inflammable substance and had been deliberately set."

Substantially the same facts were submitted hypothetically to Mr. Heidinger, but he was asked if he had an opinion "as to what was the cause of the fire." Appellant objected because the question did not contain sufficient facts and called for a legal conclusion. Mr. Heidinger's answer was that the factual evidence "indicates that there burned in that completely burned out area some highly inflammable substance or liquid."

Cases can be cited in which it has been held that the cause of a fire is not the proper subject matter for the admission of opinion evidence. Usually the reason given is that the jury, as ordinary men, are able to draw their own conclusions without the aid of opinion evidence. Cole

v. Empire District Electric Co., 331 Mo. 824, 55 S.W.2d 434; Rodefer v. Grange Mut. Ins. Co. of Lewis County, Mo.App., 91 S.W.2d 112; Miller v. Great American Ins. Co. of N. Y., Mo.App., 61 S.W.2d 205; State v. Cuthrell, 233 N.C. 274, 63 S.E.2d 549; People v. Grutz, 212 N.Y. 72, 105 N.E. 843, L.R.A.1915D, 229, Ann.Cas. 1915D, 167; Annotation, 131 A.L.R. at page 1124. Cases can also be cited where such opinion evidence was held to be proper. State v. Harris, 150 Kan. 536, 95 P. 2d 269; State v. Kolander, 236 Minn. 209, 52 N.W.2d 458; Commonwealth v. Nasuti, 385 Pa. 436, 123 A.2d 435; State v. Gore, 152 Kan. 551, 106 P.2d 704, 131 A.L.R. 1108; Manney v. Housing Authority of City of Richmond, 79 Cal.App.2d 453, 180 P.2d 69; State v. Director, 113 Or. 74, 227 P. 298, 231 P. 191; Annotation, 131 A.L.R. at page 1124. An examination of these cases reveals that the real question is not whether opinion evidence is admissible to prove the cause of fires generally, but whether it is admissible to prove the cause of the particular fire. This was expressly recognized in Cole v. Empire District Electric Co., supra, where it was stated that no reason appeared in that case why a jury composed of laymen could not draw proper conclusions from the facts without the aid of the opinion of an expert as to the cause of the fire, but "if this were a case calling for an expert opinion, there is no question but what the expert should have been permitted to answer the hypothetical question and give his opinion as to the cause of the fire." [331 Mo. 824, 55 S.W.2d 438.] Therefore, whether opinion evidence as to the cause of a fire is admissible depends upon whether the facts and circumstances shown by the evidence are such that a person of special skill by reason of training or experience in the field of determining the cause of fires would be able to draw an inference from the facts established where men of common experience, such as are on a jury, would be left in doubt or without reason to form intelligently an opinion. There

can be no question but that the facts in evidence were such that the cause of the fire in this case would not be within the common knowledge and experience of ordinary persons, and that the opinion of an expert in the field of determining the cause of fires would be helpful to the jury to explain the results shown by the evidence and to trace those results back to their causes.

We turn now to the specific contentions made by appellant on this appeal. He first contends that the admission of the opinion testimony of the expert witnesses was erroneous because "said opinion is as to an ultimate fact and invades the province of the jury." In Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122, 129, it was stated that "An expert opinion expressed by one properly qualified and based upon sufficient means of knowledge is evidence. Scanlon v. Kansas City, 325 Mo. 125, 149, 28 S.W.2d 84, 95 [13, 14]. The *province* of the jury is to hear all of the evidence including opinion evidence, to weigh it all, and to decide the issues. Thus an opinion (evidence) cannot 'invade the *province* of a jury,' and this [is true], even though the opinion is upon the very issue to be decided. An objection that an expert opinion invades the province of the jury is not a valid one." See also State v. Cochran, 356 Mo. 778, 203 S.W.2d 707, 713; State v. Brown, Mo.Sup., 291 S.W.2d 615, 619; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co., 237 Mo.App. 511, 175 S.W.2d 930; VII Wigmore on Evidence, 3rd ed., § 1920. Every expert opinion to a certain extent "invades" the province of a jury in the sense that it constitutes a conclusion gathered from facts, but as stated in State v. Cochran, supra, 203 S.W.2d at page 713, " 'An expert witness, in a manner, discharges the functions of a juror' because, in matters in which intelligent conclusions cannot be drawn from the facts by inexperi-

enced persons, experts, 'who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion.'" See also, Benjamin v. Metropolitan Street Ry. Co., 133 Mo. 274, 34 S.W. 590, 593 and Cole v. Empire District Electric Co., supra. Therefore, the mere contention on this appeal that the admission of expert testimony invaded the province of the jury presents no basis for finding prejudicial error.

■ The next contention, that the opinion of the experts was as to an ultimate fact, is but another way of expressing the objection that an opinion invaded the province of the jury. See VII Wigmore on Evidence, 3rd ed., § 1921, and II Wharton's Criminal Evidence, 12th ed., § 518. Every opinion of an expert witness is to an "ultimate" fact in the sense that it is a conclusion based upon facts supported by the evidence. We may assume that it would not be proper for an expert witness to express his opinion on the ultimate issue of whether appellant was guilty of the offense charged, but that was not done here, and as this court recognized in the Eickmann case, opinions of experts are often admissible upon vital issues which only the trier of fact may decide. Therefore, the mere contention that the opinion of an expert witness was to an ultimate fact does not demonstrate the existence of prejudicial error.

Appellant's objections that the opinions had no factual foundation in the evidence and that they were based on speculation and conjecture, in substance, are the same. We note that at the trial appellant never objected to the hypothetical questions for these reasons, and after the answers were given no motion to strike was made for those or any other reasons. In addition, these objections are not mentioned in the motion for new trial.

■ Objections to evidence must be specific and call attention of the trial court directly to the ground upon which objection is made, and upon appeal the defendant is not entitled to broaden the scope of his objection beyond that made in the trial court. State v. Smith, Mo. Sup., 261 S.W.2d 50; State v. Miller, 364 Mo. 320, 261 S.W.2d 103; State v. Lord, Mo.Sup., 286 S.W.2d 737; Supreme Court Rule 27.20, 42 V.A.M.S. The reason for this rule is obvious. A trial court should not be convicted of improperly admitting evidence on a ground not presented to him for consideration. However, in this case the evidence was that the fire was "intense," that it caused deep "alligatoring" of the wood, and that it burned completely through the linoleum and the wooden floor at one particular place while the immediately adjacent floor was not burned. These facts had special significance to persons specially trained in determining the cause of fires. Mr. Heidinger utilized his experience and special training and interpreted these and other facts in an effort to trace the results back to their causes, and in doing so concluded that some highly inflammable substance was present such as gasoline. Such opinion obviously was not without factual basis, and was not based on speculation and conjecture.

■ The testimony of Mr. Moran that in his opinion the fire was incendiary in origin, which admittedly means that it was set, is not so clear. But in Commonwealth v. Nasuti, 385 Pa. 436, 123 A.2d 435 and also in Commonwealth v. Kaufman, 182 Pa.Super. 197, 126 A.2d 758, expert testimony that a fire was of "incendiary origin" was held to be proper; in State v. Gore, 152 Kan. 551, 106 P.2d 704, 706, 131 A.L.R. 1108, expert testimony that a fire "had been set" was held proper; in State v. Kolander, 236 Minn. 209, 52 N.W.2d 458, 463, it was held proper for an expert to express the opinion that "the fire was 'torched'; that is, aided by some foreign substance such as gasoline"; and in Sawyer v. State, 100 Fla. 1603, 132 So. 188, it was held that it was not reversible error for the chief of the fire department

to testify that in his opinion a house had been set on fire by use of gasoline. See also II Wharton's Criminal Evidence, 12th ed., § 517, where it is stated "exceptional cases may arise which would justify the admission of expert opinion testimony on such a question [whether the fire was or was not of incendiary origin] as an aid to the jury in arriving at their determination." The testimony in this case clearly supported a finding that the fire was of the type which resulted from the presence of some highly inflammable substance other than the material and contents of the building, and that the fire was not caused by escaping butane gas. Therefore, we cannot say that the opinion of Mr. Moran was totally without factual support in the evidence. The subject was one for expert testimony, and in view of the fact that appellant did not object to the expert testimony on the basis that it was without factual support and was based only on speculation and conjecture we conclude that no prejudicial error resulted.

During the closing oral argument counsel for the state said: "I believe the conditions of his parole were that he was to pay $20.00 a week for the support of those children. Did he do it? And what happened? I think it was at that time that this defendant concocted this scheme for alleviating all of his troubles." Subsequently counsel for the state also said, "I believe you can readily recognize the fact that all crimes are done in secret beyond the range of any eyewitnesses. And with that in mind, and with the scheming process of the defendant Paglino's mind, I think started this chain." Appellant contends that the trial court erred in overruling his objection to each of the above statements and in refusing to declare a mistrial because of them. The substance of his contentions is that by the above comments counsel for the state in effect told the jury that it was his personal belief that appellant was guilty.

"The law is well settled that the prosecuting attorney may not express his private opinion or knowledge of a defendant's guilt but where it is apparent that his opinion is based solely on the evidence in the case he may properly argue that, in his opinion, defendant is guilty." State v. Groves, Mo.Sup., 295 S.W.2d 169, 173. See also State v. Burchett, Mo.Sup., 302 S.W.2d 9. In State v. Pope, 338 Mo. 919, 92 S.W.2d 904, 907, the only case cited by appellant, the prosecuting attorney argued to the jury that "I honestly believe, in my heart, he is guilty. I believe he is guilty, and I believe he is guilty under the evidence." That argument clearly indicated that the prosecuting attorney believed the defendant was guilty because of matters extraneous to the evidence, and for that reason it was held to be improper. But, in this case, in addition to the fact that what the prosecuting attorney said was based upon his interpretation of the evidence, which he was entitled to present, it did not amount to an expression of his personal belief of guilt, but at most constituted only a comment as to certain facts he believed to be shown by the evidence. No prejudicial error resulted from the argument.

Appellant contends that it was prejudicial error to show that he had previously been convicted of the crime of failing to support his children. He relies principally on State v. Reese, 364 Mo. 1221, 274 S.W.2d 304. However, in his brief appellant admits that there are exceptions to the general rule that proof of separate and distinct crimes are not admissible, and he sets forth in his brief the rule from State v. Reese which expressly permits the proof of a separate crime when it tends to establish motive for the commission of the offense charged. Appellant contends that "you must tax your imagination some to say that a conviction for nonsupport and a parole on said conviction is a motive for arson or even a motive to try and make the world think you are dead," and he then argues, and it seems to us as a non sequitur, that in attempting to attach to him the intelligence necessary to concoct the

scheme which the state contends he carried out in order to create the impression that he was dead he is not given credit for having enough intelligence to stay away from the places where he was well known, at least until later than the day following his funeral.

■■■■■ Proof of the commission of a separate and distinct crime is admissible as an exception to the general rule excluding such proof when it tends to establish motive for the commission of the crime charged. State v. Fisher, Mo.Sup., 302 S.W.2d 902; State v. Reese, supra; State v. Hepperman, 349 Mo. 681, 162 S.W. 2d 878; State v. Jackson, Mo.Sup., 267 S.W. 855. The circumstance of appellant's conviction for nonsupport of his children, when considered with the other facts of this case, unquestionably constituted an essential link in the chain of events establishing a motive. It is not a valid objection to such proof that if appellant had enough sense to figure out the complicated scheme for creating the impression he was dead he also would have had enough sense not to get caught.

We find that the evidence is sufficient to support the verdict, and that no prejudicial error resulted in any of the respects contended by appellant. Therefore, the judgment is affirmed, and the sentence shall be executed.

BOHLING, C., concurs.

BARRETT, C., dissents.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.

On Motion for Rehearing

PER CURIAM.

In his motion for rehearing appellant contends that the principal opinion ignores and is in conflict with Waldron v. Skelly Oil Co., 363 Mo. 1146, 257 S.W.2d 615, and with Craddock v. Greenberg Mercantile, Inc., Mo.Sup., 297 S.W.2d 541, 548. In both cases it was held that opinions of an expert witness were based on assumed facts which were not supported by evidence and were, therefore, mere conjectures and not proper inferences. In the Craddock case the issues were whether an explosion occurred, and if so, its cause. The court stated that "To start with the assumption or conclusion that an explosion occurred, and then to give expert opinion as to its cause and mechanics, is almost to lift one's self by his own bootstraps." The situations in these two cited cases are by no means comparable to what we have here. Appellant does not attempt to set forth in his motion what facts he contends the expert witnesses wrongfully assumed. Certainly, the expert witnesses did not wrongfully assume that there was a fire. We pointed out in the principal opinion that the expert witnesses based their opinions as to its cause on facts established in the evidence, and that in addition, appellant did not object to the expert testimony on the basis that it was without factual support. There is no conflict with the two cited cases.

■■■■ Appellant next contends that the principal opinion conflicts with the opinion in the previous appeal in this case and with State v. Allen, 363 Mo. 467, 251 S.W.2d 659, because the evidence in the first and second trials was substantially the same. In the Allen case it was held that rulings made on appeal concerning comments of the state's attorney and the admissibility of evidence constituted the law of the case on a second appeal when the evidence was substantially the same. Appellant contends that the law of this case on this second appeal is that no submissible case was made. In the principal opinion we specifically pointed out material and substantial evidence which was presented in the second trial and which was not present in the first trial. We need not set it out

again. Therefore, State v. Allen is not applicable and the principal opinion is not in conflict with it or with the opinion in the first appeal of this case.

Appellant also contends that the principal opinion ignores and is in conflict with State v. Ruckman, 253 Mo. 487, 161 S.W. 705. In that arson case the evidence was held to be insufficient to support a verdict of guilty although there was proof of the incendiary nature of the fire, of a motive on the part of the defendant, and of a "possible opportunity" for him to have carried out such motive. Appellant does not point out in what particular respects he contends there is a conflict with the Ruckman case, but of course the final result is different. In State v. Ferrara, Mo.Sup., 320 S.W.2d 540, 545, in commenting on the Ruckman case, it was said: "However, in that case the court was careful to point out that the *state's own witnesses* put defendant in his hotel room two hours before the fire, and that he did not again leave the hotel until he was awakened and informed of the fire. It is understandable, then, that in ruling as it did, the court observed: 'On the other hand, the state's own evidence tends to show that the defendant did not cause the fire.'" We do not have that situation in the present case. There can be no question but that the state clearly established the motive and opportunity of appellant to set the fire. We previously concluded, and after additional review by reason of the motion for rehearing we again conclude, that the testimony of the expert witnesses and the facts and circumstances outlined in detail in the principal opinion are legally sufficient to authorize the finding by the jury that the fire was of incendiary origin. There was no evidence on the part of the state which even tended to show that defendant was not responsible for the fire. We find no conflict between the Ruckman case and the principal opinion.

Appellant next, and for the first time, raises the question of double jeopardy. No cases are cited. It is his contention that "In a criminal cause the state does not get two shots at the defendant when the reversal in the first instance is because of a failure to make a submissible case."

The constitutional privilege or right not to be put twice in jeopardy for the same offense is personal and may be waived. Ex parte Dixon, 330 Mo. 652, 52 S.W.2d 181; State v. Reynolds, 345 Mo. 79, 131 S.W.2d 552; State v. Harper, 353 Mo. 821, 184 S.W.2d 601. We do not rule on the question of whether in this case the defense of double jeopardy can be raised for the first time in a motion for rehearing in an appellate court because, in any event, after the first conviction appellant moved for a new trial on the ground that no submissible case was made against him, and "The general rule is where a defendant, convicted in a criminal prosecution, moves for a new trial, the granting of the motion and putting him on trial a second time is not a violation of his constitutional right not to be put in jeopardy twice for the same offense." State v. Patton, Mo.Sup., 308 S.W.2d 641, 644. See also the exhaustive discussion in the Patton case of the precise issue here presented.

Appellant's motion for a rehearing or in lieu thereof to transfer the case to the court en banc is denied.