**STATE of Missouri, Plaintiff-Respondent,**

v.

**Rosalyn NELSON, Defendant-Appellant.**

**No. 13108.**

Missouri Court of Appeals, Southern District, Division Two.

June 27, 1984.

Motion for Rehearing or Transfer Denied July 17, 1984.

Application to Transfer Denied Sept. 11, 1984.

Robert G. Duncan, Edward A. Coulson, Kansas City, for defendant-appellant.

John Ashcroft, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

A jury has found defendant Rosalyn Nelson guilty of spousal homicide by manslaughter in contravention of the provisions of § 565.005, RSMo 1978,[1] and her punishment has been assessed at imprisonment for a term of 3 years. She appeals. We affirm.

Defendant married her husband, Ronald Erwin Nelson (hereinafter "Ron" or "Ronzo" or the victim), in December 1980. At the time of the victim's death, he and the defendant lived in a two-story house in Gallatin, Missouri. Three of defendant's children by prior marriages lived with them. The victim leased and operated a tavern. He also conducted an automobile detail cleaning operation. The defendant assisted in both businesses.

On the night of August 5, 1982, defendant and the victim were both working at the tavern. Shortly before midnight Ron left the tavern and went home. A flash fire occurred at the Nelson residence shortly after 1 a.m. Firemen and police officers arrived about 1:15. They discovered the victim lying halfway through an open upstairs window on the southwest side of the house. The room from which the victim had attempted to escape was a second-floor bedroom near the south end of a second-floor hallway, about 15 feet above the ground. The pattern of the fire and the autopsy finding that the victim died as a result of burn injuries peculiar to very hot fires convinced the Daviess County authorities that his death had been intentionally caused. This prosecution followed.

In this court, the defendant challenges the sufficiency of the evidence to support the judgment of conviction, but only with respect to her criminal agency. No complaint of instructional error is made. There is no assertion that the verdict reflects prejudicial ambiguity or inconsistency. We therefore set to one side the vexing problem of the proper gradation of homicides under present statutes. The ambiguities which caused concern were finally resolved in our Supreme Court's rulings in *Love v. Missouri*, 670 S.W.2d 499 (Billings, J., concurring) (Mo. banc 1984) and *State v. Baker*, 636 S.W.2d 902, 904–5 (Mo. banc 1982). We are not required to ignore the difference between first-degree murder as defined by present § 565.003 and manslaughter as defined by present § 565.005. There was a quarrel between the defendant and her husband shortly before the fire occurred. We do not say there was substantial evidence of adequate provocation; we merely say that the finding of the jury is not entirely illogical and we are not required to pursue the subject.

Having said that, and realizing that manslaughter is not first-degree murder, for convenience we refer to *State v. Petersen*, 640 S.W.2d 123, 124 (Mo.1982), for a statement of the elements of homicide by arson. They are: 1) The occurrence of

1. References to statutes and rules are to RSMo 1978 and Missouri Rules of Court (13th ed. 1982), except where otherwise noted.

a fire which causes the death of a person; 2) an opportunity on the part of the accused to set the fire; 3) an incendiary fire, which 4) was ignited by the defendant. Id. at 124; *State v. Paglino*, 319 S.W.2d 613, 621 (Mo.1958). When the proof of guilt is circumstantial, the circumstances on which the State relies must be consistent with each other and the guilt of the accused. The evidence must be inconsistent with a hypothesis of innocence and must exclude every rational hypothesis except that of guilt. *State v. Petersen*, 640 S.W.2d at 124.

■■■ This last rule is tempered by the equally well established principle that the circumstances need not be absolutely conclusive of guilt nor demonstrate the impossibility of innocence, and the mere existence of other possible hypotheses is not enough to take the case from the jury. *State v. Morgan*, 592 S.W.2d 796, 805 (Mo. banc 1980); *State v. Franco*, 544 S.W.2d 533, 534–35 (Mo. banc 1976), cert. denied 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). Further, even when the State's proof of guilt is entirely circumstantial, all evidence upon the whole record tending to support the guilty verdict must be taken as true, contrary evidence must be disregarded and every reasonable inference tending to support the verdict must be indulged. *State v. Lee*, 556 S.W.2d 25, 32[13] (Mo. banc 1977); *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo. banc 1969); *State v. Morris*, 564 S.W.2d 303, 304[1] (Mo.App.1978).

The State produced a number of photographs and diagrams in aid of its proof. We do not have all the exhibits before us, but those which we have show that the Nelson residence was a two-story frame and stucco house with a steeply-pitched gable roof. There were second-floor dormer windows on both the south (front) and north (rear) sides of the house, presumably to provide natural light and ventilation for the second floor.

The fire was confined to the second floor. The two floors were joined by a stairwell which enclosed two parallel flights of stairs. We take it that this stairwell is somewhere near the rear (north) side of the house. The steps ascended 8 to 10 steps northward to a landing; the second flight consisted of 4 or 5 steps which ran parallel to the first flight. At the top of the staircase there was a bannister immediately to the right (west) of the staircase. This bannister was immediately above the landing.

At the top of the stairs there was a second-floor hallway which ran south 18 feet. It was 5 feet wide. Ron was sleeping in a second-floor bedroom which opens to the west (right) off the south (front) part of the second-floor hallway.

It is beyond cavil that the victim died as a result of a fire. Dr. Kirk Arnold, a Kansas City pathologist, was the autopsy surgeon. This physician noted extensive burns on the victim's body but concluded it was more likely that he had died as a result of laryngospasm induced by the inhalation of heat and the toxic substances produced by the fire.

The State had the following evidence tending to prove that the fire was an incendiary fire:

a) The flames were limited to the second-floor hallway. This hall provided passage to a bathroom and two bedrooms, including the victim's bedroom, which had no door. Samples of the hall carpet showed the presence of gasoline.

b) "Burn patterns" on the hall carpet, diagrammed after the fire, resembled puddles connected by a thin line. This phenomenon is known as a "pour pattern." To the trained eye, the pour pattern indicates the area upon which and the direction in which a flammable liquid has been poured onto a carpet or other surface. The expert testimony was that about one gallon of gasoline had been used.

c) Burn patterns on the hallway walls indicated the presence of a fire accelerant. The arson investigators who inspected the premises found a "v-pattern" on the walls. This pattern indicates the nature of a fire's origin. A fire of accidental origin produces a normal "v-pattern." The pattern found in the second-floor hallway of the Nelson

residence showed an "inverted v-pattern." Such an inverted "v-pattern" indicates an incendiary fire caused by the use of a flammable liquid placed at a low level. Upon ignition, the vapor "flashes" so as to scorch the adjacent walls at a higher level, producing the "inverted-v."

d) There was discoloration of the metal corners on a clothes closet or locker standing in the hall and a light bulb which hung from the ceiling had been melted out of round. Damage to the ceiling, especially to the access inlet to the attic, indicated damage by a very hot flame. A knowledgeable forensic pathologist testified that even if the fire was of relatively short duration, heat of the order of 2000–4000°F would have been created.

e) The arson investigators found a strip of sheet-like cloth on the hall floor. This strip extended down the hall from south to north, then between the second and third posts of the bannister so that it hung from the second-floor hall toward the landing at the top of the first flight of stairs, and could be reached from the steps below the landing. Such a device is referred to as a "trailer" and serves the function of a fuse.

This evidence has been recited in detail to show that the fire was of incendiary origin. Further, the careful preparation of the premises for burning has a distinct bearing on the defendant's criminal agency, which is the only issue before this court.

We bear carefully in mind that presence and an opportunity to set an arsonous fire do not establish the defendant's guilt. *State v. Paglino,* 291 S.W.2d 850, 856 (Mo.1956). Few cases, however, present the bizarre and fantastic circumstances of the *Paglino* cases, and the usual rule to be applied is that the truth of the testimony and the reasonableness of the inferences to be drawn therefrom are for the jury. *State v. Berkowitz,* 325 Mo. 519, 526, 29 S.W.2d 150, 153 (1930). There is a line of cases which clearly holds, in varying circumstances, that when the evidence shows a careful preparation of the premises for burning, evidence that the defendant had the means, opportunity and motive for

setting the fire may sustain a finding of the defendant's criminal agency. *State v. White,* 37 S.W.2d 412, 413[1] (Mo.1931); *State v. Rudman,* 327 Mo. 260, 37 S.W.2d 409 (1931); *State v. Berkowitz,* 325 Mo. at 526–27, 29 S.W.2d at 153[4–6].

Following are circumstances which indicate the defendant had the means, opportunity and motive to set the fire:

a) The defendant certainly had the means to prepare and set the fire. There was a good deal of controversy during the trial about the exact location of a gallon container of gasoline which may have been used by the defendant, but the precise location of exhibit 37, which the State insisted was used, is a matter of relative unimportance. There was plenty of gasoline around the house.

b) The victim left the tavern which he and the defendant operated before the defendant left. There is evidence from which it could be inferred that he went directly to his residence and retired. The evidence permits the inference that the defendant left the tavern and went home about an hour later.

c) The victim and the defendant were the only two persons present in the house. Two of the defendant's children were visiting in Iowa. The third had been told to spend the night with a friend.

d) The victim had been drinking and ordinarily slept heavily. The defendant's son testified that "Ronzo" "slept pretty hard" and was "difficult" to awake. Presumably, the victim's habits were known to the defendant.

e) The defendant inferably had a bad, or high temper. There was evidence from Jo Trow, a rebuttal witness, that in June 1981, defendant had quarreled with her husband and had become angry enough to attempt to "run over" or assault her husband by driving a pickup toward him at high speed.

f) There was evidence that defendant and the victim had quarreled shortly before the fire occurred and further evidence that the two had had a heated argument in

the tavern shortly before the victim left the tavern.

g) State's exhibit 4 is a color photograph of the Nelson residence which, when properly oriented, shows, as noted above, that the victim was sleeping toward the south end of the second-floor hallway.

■ Gary McMahon, Chief Deputy State Fire Marshal, testified as follows:

" * * *

Q. Deputy McMahon, was this fire a natural fire, an accidental fire, an intentionally set fire? A. An intentionally set fire.

* * * * * *

Q. Where did the fire begin? A. It began at the extreme north end of the second floor hallway.

Q. And what direction did the fire move after it started? A. From the north end to the south end of the hallway.

Q. And did this fire begin slowly or did it begin rapidly? A. Rapidly.

Q. When you say, 'rapidly,' can you explain why you determined that it moved—that it was a rapid fire? A. A flammable liquid was applied to the floor, ignited, and it was almost an instantaneous high heat fire and then it dissipated."

In the circumstances here present, this testimony did not invade the province of the jury; to the contrary it was competent and was properly received to show where the fire started. *State v. Paglino,* 319 S.W.2d at 624[13].

■ The whole record considered, the evidence is sufficient to support a finding that the defendant was the incendiary. Counsel has not articulated a rational hypothesis of innocence; we conclude the only possible alternative hypothesis is that the victim awoke from a deep, partially intoxicated sleep, set the fire himself and then attempted to jump out the window. There was evidence that the victim had a fear of height. As noted at the outset, the State was not required to demonstrate the impossibility of innocence, and the mere existence of other hypotheses is not enough to take the case from the jury. The evidence is sufficient to submit the defendant's guilt.

The defendant also complains that the trial court erred and abused its discretion in allowing witness Jo Trow to testify because she remained in the courtroom in violation of the court's order excluding witnesses therefrom. It appears that witness Trow was indeed present in the courtroom during part of the trial.

The point is overstated. After some preliminary matters had been taken up, defense counsel addressed the court as follows:

"MR. DUNCAN: Maybe this isn't the time for it, we'll request the witnesses be excluded from the courtroom.

THE COURT: During the voir dire and—

MR. DUNCAN: During the voir dire and during the jury trial.

* * * * * *

THE COURT: I think the bailiff is getting [the panel] all lined up .... Did you want the witnesses called in and instructed at this time or is it satisfactory to let each side watch?

MR. DUNCAN: It's satisfactory to let each side watch."

■ It appears, therefore, that the trial court never formally segregated the witnesses. It was not obliged to do so. Even if segregation of the witness is requested, the request is addressed to the discretion of the trial court. *State v. Tillman,* 454 S.W.2d 923, 925 (Mo.1970). Since the trial court never ordered the witnesses excluded from the courtroom, the witness violated no order. In any event it was in the trial court's discretion to permit witness Trow to testify. *State v. Lord,* 286 S.W.2d 737, 741[13–16] (Mo.1956). There is nothing in the record to indicate the trial court abused its discretion.

■ The defendant also assigns error to the trial court's refusal to admit expert evidence tending to show the screen from which the victim was found hanging

had been cut rather than pushed out. Such evidence, it is argued, would have tended to establish innocence by showing, as we follow the argument, that the victim started the fire himself. The point is governed by the rule that the admission or rejection of expert testimony is a matter resting in the discretion of the trial court, *State v. Purnell*, 621 S.W.2d 277, 280 (Mo.1981), as are matters of the relevancy and materiality of evidence offered. *State v. Wickizer*, 583 S.W.2d 519, 524 (Mo. banc 1979). By the time the defendant's offer was made, the jury was already burdened with a stupefying amount of expert testimony. As we have observed, the likelihood that the victim himself set the fire was very remote. We find no abuse of discretion.

We find no error in any respect briefed or argued in this court; accordingly, the judgment is affirmed.

MAUS, P.J., and PREWITT, J., concur.