HOMER COLE and PAUL STELTS, Appellants, v. THE EMPIRE DISTRICT ELECTRIC COMPANY, a Corporation.—55 S. W. (2d) 434.

Division One, December 20, 1932.

*R. S. Mallett, Grover C. James* and *Ray Bond* for appellants.

*A E. Spencer, Jr.,* and *A. E. Spencer* for respondent.

826

FRANK, P. J.—Action by appellants, plaintiffs below, to recover damages for the loss by fire of a garage building and contents alleged to have been caused by the negligence of defendants. The trial court directed a verdict for defendant, whereupon plaintiffs took an involuntary nonsuit with leave to move to set the same aside. Later the motion to set aside the nonsuit was overruled and plaintiffs appealed.

The evidence favorable to plaintiff tends to show the following facts:

Plaintiffs owned a garage building in the town of Seneca in which they operated a garage and repair shop. Defendant, a corporation, was engaged in furnishing and selling electric current for lighting and power purposes to the residents of the town of Seneca, and furnished electric currrent to plaintiffs for lights and power in their said garage building. The building had a frontage of fifty feet, north and south, and a depth of 125 feet, east and west. The main part of the building was 50 by 100 feet facing on the business street and was constructed of stone with ship-lap roof. At the rear of the stone building and connecting therewith was a frame structure twenty-five feet in depth and of the same width as the stone building. The floor of both buildings was all concrete. The walls of the frame building were constructed of ship-lap covered with sheet metal. The inside walls and ceiling were covered with tar building paper.

The stone building was used as a garage and the frame building as a repair shop. Electric power for one motor was used from the power circuit, and electric current from the light circuit was used for lighting, and the operation of some small motor driven tools. The motor on the power circuit operated an air compressor. The poles and lines of defendant company were located in the alley about 30 feet from the rear of plaintiffs' building, and a transformer from which the wires were extended into plaintiffs' building was on a pole in this alley.

Defendant company, was making a change from a 25-cycle to a 60-cycle system. On and prior to December 12, 1926, four electric wires extended from the lines in the alley into plaintiffs' garage through the rear wall of the frame building, entering ten or twelve feet from the ground where they were attached on the inside of the said wall to two meters. One meter was used for the power circuit of 220 volts and the other for the light circuit of 110 volts, wires being connected with each meter, from which they extended into various parts of the building. A strip approximately six inches wide and about eighteen inches long had been removed from the sheet iron covering the rear wall of the frame building so as to permit the wires to pass through holes in the wall into the room; and these four wires passed through porcelain insulators in the wall. The two meters and one switch were attached to ordinary pine boards nailed to the rear wall just below where the wires entered. The switch was attached to the north end of this board and just above the switch there was a fuse for each of the two wires on the light circuit. The two wires ran from the switch to the light meter, which was next attached to the board, and from there extended throughout the building for lighting purposes, and for the operation of small tools attached to light sockets. The only other equipment on this board was the power meter which was fastened at or near the south end of the board. The other wires came in from the pole line through the board wall and directly into the power meter, and extended from the power meter to a one and one-half h. p. two-phase motor located near the northeast corner of the stone building, just inside of the east wall. There was no fuse nor switch between the meter and the outside. Immediately above this motor there was a switch and also a fuse on each line. The tar paper was tacked on the top side of this board, about four inches from the meter.

On December 12, 1926, a foreman and other employees of defendant replaced this motor with a sixty cycle motor of the same horsepower, said replacement being made necessary by reason of changing the electrical system from twenty-five cycle to sixty cycle. At the same time they installed an additional wire extending from the lines in the alley into and through the rear wall of the frame building

and in close proximity to the wires which were installed and in use prior to that time. They bored a hole through the wood wall and the tar paper for the purpose of carrying this additional wire to the inside. The wire was insulated, but was not run through any porcelain or other insulator and there was nothing between the wire and the wood wall and tar paper and it came in close contact with both. This wire was connected with and attached to the power meter without any switch or fuse being installed before it reached the meter. At that time the foreman stated to one of the plaintiffs that such installation was not right, but when they changed the meters, which they contemplated doing in a short time, they would make it safe. Three days thereafter, the employees of defendant returned to the garage for the purpose of changing the power meter. The power was shut off to enable this change to be made. The power meter that had been used prior thereto was removed and another meter installed in the same place to which the wires were connected. No switch or fuses were then installed between that meter and the outside, and no change was made in the installation of the additional wire put in on the previous Sunday. The power was turned on and the switch to the new motor was opened for the purpose of operating the pump to fill the air tank. From fifteen to thirty minutes after the new motor was turned on a fire started on the inside of the frame part of the garage where the meters were installed on the rear wall. No one was present in the room where the fire started. Mr. Cole and other witnesses who were then in the office at the front of the stone building heard a "cracking" noise which sounded to them like a fire, and upon investigation Mr. Cole saw flames shooting upward from the meters, and the tar paper above that place and extending upward into the ceiling was in flames. There was then no fire or flames at any other place except at and above the meters. About that time two young men standing in the yard of their home just across the alley and opposite the garage observed flames shooting upward from the wires where they entered the building and also observed that at that time there was no fire whatever on the outside below the place where the wires entered the building. The meters were destroyed by the fire.

Other facts will be stated in course of the opinion.

Appellants raise two questions, (1) that the trial court erred in refusing to permit appellant's expert witness, Roth, to give his opinion as to what caused the fire, and (2) that the trial court erred in directing a verdict for defendant.

It is our judgment that plaintiffs' evidence made a case for the jury. Three eyewitnesses saw the fire shortly after it started. Homer Cole, one of the plaintiffs, was in the office of the garage when the fire started. He heard a cracking noise which he thought was a fire. He testified:

"When I heard the cracking sound I stepped out of the office and looked for a car to be on fire somewhere. The garage was full of cars, but I couldn't see a fire anywhere, so I went back, and when I got about one-half way back I could see from where I was the paper was all afire where those meters were and on up. I ran back and tried to put it out with a little extinguisher and realized it was too small; the fire caught the rest of that paper and was going toward the front up the roof. I thought I had better get out and try to save some stuff and I ran to the front and it broke out. When I discovered the fire it was running from the meter up and running up the other wall, starting along the ceiling."

Two brothers, Forest Nelson and Parson Nelson were in the back yard of their home just across the alley from the rear of the garage when the fire started. Forest testified:

"The first thing I noticed was where the light wires went in the back of the garage there was a blaze running from where these light wires went into the building. The insulation was burning and trickling up the back of the garage. To the best of my judgment these wires were about six or seven feet above the ground; I never measured it. The flames were shooting up about nineteen or twenty inches above the wires when I first saw them. There were no flames below the wires at all."

Parson testified:

"At that time it was at the back end of the garage where the electric wires were in those little holes cut in there. I saw Forest when I ran out. He was out in the yard while I was in the woodhouse. I was there when he started to run around the garage. When I first saw the fire it was running out of the holes, and burning above the wires, something like 15 or 18, maybe 20 inches. There was no fire that I saw below the wires. After I saw the fire I went around in front of the garage. The insulation was burning off of the wires about two or three inches back from them and there was a little hole cut in the building and the fire was burning right around there, flaming up a little piece."

The evidence of these eyewitnesses that the fire started at the location of the meter, and that the insulation was burning off the wires, tended strongly to show that the fire was of electrical origin, especially so, in view of the total absence of evidence which would tend to show that it originated from any other source. [Eastern Oklahoma Light & Power Co. v. Hare, 142 Okla. 283.] However, the fact that plaintiffs' evidence tended to show that the fire was of electrical origin would not make a case for the jury unless their evidence also tended to show that the fire was caused by the negligent acts of defendant as alleged in the petition.

An expert electrician testified in the case. His evidence is fairly stated in appellants' brief, in substance, as follows:

Mr. H. C. Roth, a graduate electrician of many years practical experience with meters and electrical equipment, testified as an expert that the proper method of installing wires carrying 220 volts through a pine wall was to put porcelain tubes through the board and run the wires through the tubes to keep the wires from getting in contact with anything likely to be set on fire; that in the absence of a porcelain tube, if there is a short circuit or overload on the wires or a hot wire or hot meter, fire will likely result if the hot wire is against something inflammable, such as wood or paper; that all circuits should have fuses between the pole line and the meter on the inside or the inside wiring of the buildings for the protection against fire of all appliances that might be attached to the line or the building proper; that a fuse has the same purpose as a safety valve on a boiler and in the event of an overload or short circuit the fuse burns out, but if there is no fuse an overload or short circuit overheats the wires until either the wires burn in two or set something on fire; that there are two coils in a meter, a current coil and potential coil; that the potential coil is the pressure coil and no current should pass through it; that if current should pass through the potential coil it would likely heat it and burn the wires and set something on fire; that a meter could be improperly installed so that current would pass through the potential coil; that if the current should pass through the potential coil for a short time on account of the meter being improperly connected, the coil would heat until it would set the coil on fire, and in a short time would burn the meter; that a small motor could be operated for a short time while the current was passing through the potential coil, but the coil would eventually burn and in turn burn the meter; that, in his experience, he had seen meters with the potential coil burned where the current was too heavy or overloaded; that a meter could be improperly connected by getting the wrong wires on the connections on the meter so that the wires that should be on the current coil would be connected with the potential coil; that a loose connection would also heat a meter and might heat it to the extent of burning the meter.

The petition alleges, among other things, that defendant negligently, carelessly and improperly connected the wires leading to said meter and therefrom, so that the electric energy which passed through said meter was improperly directed through same, and caused said meter and the appliances, equipment and wires contained in said meter, connected thereto and leading therefrom, to become overheated and set fire to and destroyed plaintiffs' garage.

While there was no direct evidence in the case that the connections in the meter in question were loose, or that the wires leading

to and from the meter were improperly connected, yet the expert electrician testified that where the wires leading to and from a meter are improperly attached thereto, the meter will become overheated and will burn within ten to fifteen minutes after the current is turned on, and a fire will likely result if the hot wires are against something inflammable such as wood or paper. There was evidence that defendant installed a new wire leading from a pole in the alley in the rear of the garage, through a hole in the wood wall just large enough to admit the wire, without a porcelain tube or other protection to prevent the wire from coming in direct contact with the wood wall. This new wire was connected with the power meter which defendant installed. The evidence is that after the power meter was installed, the current was turned on, and within fifteen to thirty minutes thereafter a fire was discovered at the location of the meter. In other words the thing happened which the expert testified does happen when a meter is improperly installed. It therefore must follow that evidence of what happened in this case tends to show that the meter was improperly installed, because the evidence of the expert is that such happenings follow the improper installation of a meter, especially so, in view of the expert's further testimony that where a meter is properly installed, with the wires leading to and from the meter properly connected, "the meter would be in good condition, and go ahead and operate, the current being on."

We next take the contention of defendant that plaintiff failed to make a *prima facie* case that the proper installation of the meter caused the fire, in view of the possibility of fire from other electrical equipment installed by plaintiff or from sources other than electricity.

The other electrical equipment to which defendant refers as a possible source of the fire is the light meter, and the wires running from both the light and power meter to various parts of the building for light and power purposes. There is no suggestion in the record of electrical disturbances coming from the outside into either the light or power meter. Neither is there any evidence tending to show that any electrical equipment inside the building, other than the power meter which defendant installed, caused the fire. As to a possibility of the fire being caused by something other than electricity, defendant calls attention to the rapid spread of the fire, the presence of a stove which had a fire in it, an empty metal oil barrel, oil on the concrete floor in such quantities as is ordinarily seen in a garage, a chimney on the north part of the shed, the tar paper lining of the room, mechanics working on an automobile, and the statement of plaintiff, Cole, that there must have been a gas formation next to the roof. There is no evidence in the record tending to show that the presence of these things in the room had any connection

whatsoever with the starting of the fire. We do not understand that defendant contends that any of the possible sources to which it calls attention, actually caused the fire. The contention is that the evidence is such that the jury· could only speculate and guess whether the fire was caused by improper installation of the power meter, a thing for which defendant would be liable, or whether it originated from other possible causes for which defendant would not be liable.

It is familiar law that where an injury may have resulted from one of several causes, for one of which only the defendant is liable, the plaintiff must prove that such injury arose from the cause for which the defendant is liable. There would be merit in defendant's contention if the evidence tended to show that the fire resulted either from the improper installation of the power meter or from one or more of the possible sources suggested by defendant, but such is not the case. For reasons heretofore stated, the evidence does tend to show that the fire resulted from the improper installation of the power meter, a cause for which the defendant is liable. But there is no evidence in the record tending to show that the fire resulted from any of the possible causes suggested by defendant. The trial court had no right to speculate or guess that the fire might have originated from one or more of such causes in the absence of any evidence tending to so show.

Stated in small compass, the negligence alleged is that the wires leading to and from the power meter were negligently and improperly attached to the meter. This alleged negligence need not be shown by direct and positive testimony. It may be established by circumstantial evidence, that is, by legitimate inference from the circumstances shown. Evidence tending to show that where wires leading to and from a meter are improperly attached thereto, the meter will overheat and burn within ten to fifteen minutes after the current is turned on, coupled with evidence tending to show that a fire was discovered at the location of the power meter which defendant installed, within fifteen to thirty minutes after the current was turned on, tends to show that the wires were improperly attached to the meter, when the record contains no evidence tending to show that the fire originated from any other source. We therefore hold that plaintiff made a case for the jury.

In support of the contention that plaintiff failed to make a case for the jury, defendant cites State ex rel. Missouri Public Utilities Company v. Cox, 298 Mo. 427, 250 S. W. 551; Wood v. Cumberland Telephone & Telegraph Company, 151 Ky. 77, 151 S. W. 29; National Fire Insurance Company v. Denver Consolidated Electric Company, 16 Colo. App. 86, 63 Pac. 949; Consolidated Electric Light & Power Company v. Koepp, 64 Kan. 735, 68 Pac. 608; Levi v. Railway Co., 157 Mo. App. 536, 138 S. W. 699. These cases announce

well-recognized principles of law but their facts are not similar to the facts in this case, and for that reason they are not in point.

The final contention of appellants is that the court erred in not permitting the expert witness, Roth, to answer the hypothetical question calling for his opinion as to what caused the fire.

Defendant's objection to this hypothetical question was sustained. The only grounds of the objection we need give any notice are (1) that the matter inquired about is not the subject of expert testimony, and (2) the answer called for would invade the province of the jury.

The rule which determines when an expert witness should be permitted to give an opinion regarding the ultimate fact to be found in a given case, is well settled by numerous decisions of this court. In Benjamin v. Street Ry. Co., 133 Mo. 274, 288, 289, 34 S. W. 590, the rule is thus stated:

"It is the province of the jurors to draw all inferences and conclusions from the evidence before them. The witnesses, as a general rule, must state facts from which the jurors are to form their opinion. But when the facts are all stated, upon a subject of inquiry, if an intelligent opinion cannot be drawn therefrom by inexperienced persons, such as constitute the ordinary jury, an exception is made to the general rule, and persons who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion. The exception is allowed from necessity. An expert witness, in a manner, discharges the functions of a juror, and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience, or knowledge of the subject, to draw correct conclusions from the facts proved. Expert witnesses are generally selected by the parties from their known opinions on the subject in respect to which they are called to testify, and, therefore, in view of the important functions they perform, their evidence should be admitted with great caution."

Applying this rule to the facts in the instant case, it is our judgment that the trial court was correct in refusing to permit the expert to give his opinion as to what caused the fire. The evidence showed that in installing a meter, where the wires are improperly attached thereto, the meter will become overheated and burn within ten to fifteen minutes after the current is turned on, and a fire will likely result if the hot wires are in contact with inflammable material such as wood or paper. The evidence further showed that a fire was discovered at the location of the meter which defendant installed, within fifteen to thirty minutes after the current was turned on, and there was no evidence tending to show that the fire occurred from any source other than the meter which defendant installed. It was further shown that where the wires were properly

attached to a meter, it will be in good condition and go ahead and operate. No reason appears why a jury composed of laymen could not draw a proper conclusion from the facts stated without the aid of the opinion of an expert as to what caused the fire. This being true, it would have been improper to permit the expert to give such an opinion.

Appellants rely upon the case of O'Leary v. Scullin Steel Company, 303 Mo. 363, 260 S. W. 55, and cases following it, in support of the contention that the trial court erred in refusing to permit the expert witness to give his opinion as to the cause of the fire. The cases cited do not support plaintiffs' contention. Under the decision in the O'Leary case, an expert witness would not be permitted to give an opinion that a certain cause produced a given result, unless it appeared from the facts in the case that the jurors themselves were not capable of drawing correct conclusions from the facts in evidence because of their lack of experience or knowledge of the subject under consideration. Prior to the decision in the O'Leary case, this court had held, in cases to which the O'Leary case calls attention, that expert opinion evidence should be limited to an opinion that a certain cause "might or could" produce a given result. The O'Leary case overruled the case so holding, and held that in cases where opinion evidence is permissible, an expert should be allowed to give an opinion that a certain cause "did" produce a given result, instead of giving an opinion that it "might or could" have done so. Such holding is settled law, and if this were a case calling for an expert opinion, there is no question but what the expert should have been permitted to answer the hypothetical question and give his opinion as to the cause of the fire. But for reasons heretofore stated, we hold that the facts in the case are such that the jurors themselves could draw an intelligent opinion therefrom without the aid of the opinion of the expert. In that situation, it would have been improper to permit the expert to give his opinion as to the cause of the fire, and the trial court was correct in so ruling.

The trial court erred in holding that plaintiffs' evidence did not make a case for the jury. For that reason the judgment is reversed and cause remanded. All concur.