SUPERIOR ICE AND COAL COMPANY,
Appellant,

v.

BELGER CARTAGE SERVICE, INC.,
Respondent,

J. J. Eisberg, Respondent-Appellant.
No. 47479.

Supreme Court of Missouri,

Division No. 1.

Sept. 12, 1960.

W. F. Woodruff, Lucian Lane, Woodruff & Lane, Kansas City, for appellant.

David R. Hardy, Lane D. Bauer, Donald K. Hoel, Kansas City (Sebree, Shook, Hardy & Ottman, Kansas City, of counsel), for respondent.

George L. Gisler, John A. Borron, Jr., Kansas City, for respondent-appellant.

HOLMAN, Commissioner.

In 1953 plaintiff discontinued the operation of its ice manufacturing plant located at the corner of Second and Delaware Streets in Kansas City, Missouri. On October 11, 1956, plaintiff entered into a writ-ten contract with defendant J. J. Eisberg whereby it sold to Eisberg all of the machinery, pipe and equipment in its said plant for $5,500 with the buyer to dismantle and remove all of said equipment. Eisberg engaged defendant Belger Cartage Service, Inc. (hereinafter referred to as Belger) to remove the equipment from the building and the removal operations were commenced on October 15, 1956. At about 7 p. m. on November 19, 1956, a fire was discovered in the building and as a result thereof it was totally destroyed. Plaintiff filed this suit against Eisberg and Belger to recover the sum of $65,000 which was alleged to have been the reasonable value of the building. The first count of the petition was based on an indemnity provision contained in the sales contract entered into between plaintiff and Eisberg. The theory of the second count was that the fire resulted from the negligence of Belger in conducting the removal operations. Eisberg filed a cross claim against Belger in four counts. In Counts I and II he sought to recover any amount for which plaintiff might obtain a judgment against him upon plaintiff's claim. In Counts III and IV Eisberg sought to recover against Belger for damage to his personal property which was in the building at the time of the fire. Belger filed a cross claim against Eisberg in the amount of $984.90 for services it had rendered in the removal of equipment prior to the fire.

The court directed a verdict for Belger upon the first count of plaintiff's petition and plaintiff thereafter dismissed the first count as to defendant Eisberg. Verdicts were also directed in favor of Belger upon Counts I, II, and III of Eisberg's cross claim. The remaining issues were submitted to the jury and verdicts were returned (1) for both defendants on Count II of plaintiff's petition; (2) in favor of Belger upon Count IV of the cross claim of defendant Eisberg; and (3) in favor of Belger in the sum of $984.90 upon its cross claim against Eisberg. Plaintiff and defendant Eisberg have duly appealed.

The building in question was constructed in 1922. It was triangular in design with the brine tank room at the north corner (all directions are approximate), the engine room on the west corner, the office portion of the building constituted the east corner, and on the south were the ice storage rooms and the cube room. There were loading docks constructed along the south side of the daily ice storage room and along the east side of the cube room. The walls of the ice storage rooms were heavily insulated, being constructed of two walls of boxing one foot apart, with a layer of building paper on the inside of each wall, and the space between filled with wooden mill shavings. The ceilings of those rooms were constructed in the same manner except there was a three-foot space filled with wooden shavings. Upon the roof over the brine room was a spray pond which had been used for cooling the water in connection with the refrigeration processes. The entire building was covered with corrugated galvanized iron.

There was evidence to indicate that the building in 1956 (after being vacant and unused for three years) was in a bad state of repair both inside and out. Also, it was in an area of the city where it was frequented by "bums and gandies." We will detail the testimony of police officer Herman Spielberger in that regard. He testified that he would go to the Superior Ice Building six or eight times during each eight-hour shift to chase these men away from the building; that he never had any difficulty entering the building as there were always doors that were unlocked; that there was a shed about 20 feet from the northwest corner of the building where these transients "had built a home, we call them nests, where they crawl in at night"; that ashes were found from time to time indicating that they had built fires in this shed. In and around this shed these men left garbage, trash, wine bottles, whiskey bottles, and things of that nature; that these "gandies" also had nests and pallets inside the building and would leave wine and whiskey bottles in the building; that during the three weeks prior to the day of the fire he ran "gandies" out of the building every day.

Several witnesses testified that there was evidence of fires having been built by "gandies" on the concrete floor in the engine room. For about a year before the fire the office and engine room were protected by the Damon Alarm System. Mr. Damon testified that during the first three or four months after the installation the "gandies drove us crazy," but they got tired of being run out and thereafter there were not so many alarms.

Mr. Waller, president of Superior, testified that by the middle of 1956 he realized that plaintiff would not be able to sell the building and equipment as an ice plant and it was concluded that plaintiff would cause the equipment to be removed from the building and would use it as a warehouse. He then began negotiating with defendant Eisberg for the sale and removal of the equipment. After the price was agreed upon Mr. Waller had the attorney for plaintiff prepare the written sales agreement heretofore referred to.

The first count of plaintiff's petition was based upon paragraphs 7 and 8 of that agreement, which are as follows: "7. *Buyer shall Indemnify and Save Harmless the Seller.* Buyer hereby agrees to indemnify and hold harmless the seller from any cost, loss or expense resulting from personal injury or property damage occurring during the work of dismantling and removing the property. 8. *Insurance.* So that seller may be fully and appropriately protected under the provisions of paragraph 7 above; buyer shall furnish appropriate insurance coverage in favor of seller which will protect seller against any costs or expense resulting from any personal or property damage occurring during the work of dismantling and removing the property being sold."

Mr. Eisberg testified that he told Mr. Waller that he was not financially able to

procure the insurance required by paragraph 8 of the contract but that he was negotiating with the Belger Company for the removal of the equipment and that he would attempt to get the Belger Company to satisfy the requirements of that part of the contract; that he then contacted Mr. Gambill of Belger and read to him paragraphs 7 and 8 of the proposed contract and Mr. Gambill obtained a certificate of insurance from Casualty Reciprocal Exchange showing that Belger carried general liability insurance with property damage coverage of "$50,000 each accident, $300,000 aggregate." Eisberg delivered that certificate to Mr. Waller. Thereafter the contract between plaintiff and Eisberg was signed and Eisberg accepted a written proposal from Belger for the removal of the equipment from the building.

After the contract of sale was entered into Mr. Waller gave Eisberg his only key to the office and instructed him that the key to the engine room door was kept in the office. Eisberg in turn delivered the office key to the foreman in charge of the work for the Belger Company. Belger began the work of dismantling the plant on October 15, 1956, and Eisberg spent several hours almost every day watching the dismantling operations. The Belger employees used oxygen-acetylene cutting torches in the removal of the equipment. In the process of cutting, the metal was actually melted by the terrific heat of the torch and small fragments of molten metal would fly off as sparks. These pieces of metal would range in size from a sixteenth to a quarter of an inch in diameter and would often fly from eight to fifteen feet from the point of the cutting operation. These fragments of molten metal, in striking wood, would sometimes smolder and set the wood on fire. The Belger men used up several fire extinguishers they found in the building and thereafter kept buckets of water nearby to extinguish these small fires. Belger's foreman, Mr. West, testified that water worked better on that job than the fire extinguisher; that the

first work had been done in the engine room which had a concrete floor, but that when they worked in other rooms which had wooden floors, or worked near wooden walls, they would thoroughly wet the walls or floors with water before they started the cutting operation and when a piece of molten metal would hit the wood it would steam a little and then be extinguished; that on one occasion when cutting a pipe close to the wall in the engine room the wall got on fire but they extinguished the fire with water and then cut a hole in the wall in order to be sure that the fire was out.

On the day of the fire the Belger men worked on the roof until about 1:30 or 2 o'clock in the afternoon. During that time they were cutting pipe which had been used in connection with the cooling tower; they then moved to the south daily storage room and worked for a short time and thereafter were cutting pipe in the north daily storage room until about 3:45 or 4 o'clock in the afternoon. During a part of that time they were working near the ceiling. Both of the Belger employees who worked that day testified that before starting work in the storage rooms they wet the floors and walls good and also that part of the ceiling near where they were cutting pipe; that from time to time they would throw water on these areas. Some of plaintiff's witnesses testified that there were cracks in the walls of the ice storage room but Mr. West testified that these walls were constructed of tongue and groove lumber and both of Belger's men stated that there were no cracks in the walls of those rooms.

Mr. Eisberg desired to sell the ice cans in the brine tank for re-use. The Belger men encountered difficulty in removing those tanks and agreed with Mr. Eisberg that he could employ someone else to do so. Mr. Eisberg then contracted with Williams Brothers for the removal of the cans and several employees from that concern worked in the building during the morning and early part of the afternoon on the day of the fire. Mr. Williams testified,

however, that they used a cutting torch for only about ten minutes during the early part of the morning and that the sparks from that operation fell into the water in the brine tank and were extinguished.

Mr. West testified that when he and his helper quit work on the afternoon of the fire they "doused" the floor and walls of the storage rooms with water and then "nailed up" the door to the daily storage room from the outside; that his helper left about 4:15; that he then checked the roof where they had been working that morning, checked the entire building to see that there was no evidence of fire, saw that the padlock to the engine room was locked, and then left the building about 4:30 or 4:45. (The padlock to the engine room door was found among the ashes by Chief Winfrey and West two days after the fire. The shackle was inserted in the hasp but was unlocked.) West further testified that the batteries which operated the burglary alarm system were kept on a shelf in the engine room; that during the day, in stacking the ice tanks in that room, the workmen had evidently knocked these batteries to the floor as he found them on the floor when making his final check of the building and noticed that the wires thereto had been broken; that as usual, before leaving, he went by the office and turned on the alarm system although he knew it would not operate because of the broken wires in the batteries. He explained that he turned on the system so that the Damon people would know that it was not in operation and would send someone to repair it.

Kenneth Hunter, an employee of the Damon Alarm Corporation, was sent to the building to check the system; he arrived at 6:25 on the evening of the fire; he stated that he found a broken wire at a window in the office and repaired that wire and then placed the system in operation. The company records showed that it became operative at 6:41 p. m. Hunter stated that he did not go into any other part of the building.

It should be noted that if the testimony of Mr. West to the effect that the wires to the batteries in the engine room were broken was correct it could be inferred that it was necessary for Hunter to go into the engine room and repair those wires before the system could have been put in operation. Hunter stated that when he left the building he saw smoke rising from the northwest corner of the building but thought it was smoke from a switch engine.

About 7 p. m. a Kansas City Southern switch crew working nearby saw smoke coming from the building and turned in the fire alarm. Switchman O'Donnell stated that smoke was coming from the north part of the building; that in ten minutes the whole place was in flames. Engine foreman Matthews also stated that the smoke was coming from the very north end of the building. Mrs. Klokman who was working on the third floor of the building of Chase Bag Company about a half block from the Superior Building testified that she saw a red glow in the window about 7 p. m. and looked out and saw flames in the northwest corner of the Superior Building; that this was before the fire engines arrived and at that time she saw no evidence of fire in the dock area or in any other part of the building.

Deputy fire chief Hilson testified that the alarm was received at 7:02 p. m.; that upon arrival at the building he found the door into the daily storage room standing open and that the whole room was burning; that a few minutes later he circled the building and found fire in the far northwest part of the building.

In the second count of plaintiff's petition it was alleged that defendants had violated provisions of an ordinance of Kansas City, Missouri, known as the "Fire Prevention Code." A portion of that ordinance was read in evidence, as follows: "Where welding or cutting has to be done in the vicinity of combustible material, special precautions shall be taken to make certain that sparks or hot slag—from cutting operations particularly—do not reach combustible mate-

rial and thus start a fire. Wooden floors shall preferably be covered with metal or other suitable non-combustible material where sparks or hot metal are likely to fall. Concrete floors shall be protected from the heat of the blow-pipe flame or hot slag to prevent spalling."

Plaintiff offered certain expert testimony in regard to the process of cutting metal with an acetylene torch and also in regard to standard fire prevention precautions in connection with the use of such torches, some of which was excluded. This evidence will be discussed in connection with the contentions of error hereinafter discussed relating to the exclusion of such expert testimony.

■ Plaintiff contends that the court erred in directing a verdict for defendant Belger upon the first count of its petition. It is said that the evidence was sufficient to make a submissible issue as to whether Belger, by the words, acts and conduct of its agents, had agreed to indemnify plaintiff for loss or damage to its property occurring during the dismantling operation. Our view of this contention makes it unnecessary to determine that issue. We have concluded that plaintiff was not prejudiced by the direction of a verdict on Count I even though it be assumed that Belger was bound by paragraph 7 of the contract between plaintiff and Eisberg. This for the reason that said provision, when considered in the light of the facts and circumstances under which the parties were dealing, would not be construed to mean that either Eisberg or Belger was agreeing to indemnify or insure against all possible hazards. For example, under the circumstances here presented, it could not reasonably be contended that there was any intention that defendants would be liable to indemnify plaintiff if the building had been destroyed by a fire which had been communicated from a nearby building, or a fire caused by a bolt of lightning, or from some other cause not connected with the dismantling operation. A reasonable construction of the provision in question in-

dicates that the parties intended to impose liability for damage or destruction resulting from acts or omissions of Belger's employees. Plaintiff has confirmed that construction by the following allegation in Count I of its petition: "Pursuant to contract, Exhibit A, which as aforesaid Belger Cartage Service, Inc. adopted and became bound to perform, the defendants and each of them entered upon the premises of plaintiff and began and continued the work of dismantling and removing the property therefrom. While this work was in progress the defendants and each of them caused or permitted the buildings, property and improvements on said premises to be totally *destroyed by fire resulting from failure of defendants to observe proper precautions against fire.*" (Emphasis added.) The issue as to whether the fire resulted from the failure of Belger's employees to observe proper precautions against fire was clearly presented to the jury in the submission under Count II and was decided adversely to plaintiff. Note the following portion of plaintiff's main instruction: " * * * if the jury find from the evidence that employees of defendant Belger Cartage Service, Inc., on November 19, 1956, were using an acetylene cutting torch in the vicinity of combustible material and if you find from the evidence that sparks or hot slag were emitted from such cutting torch and if you find that defendant negligently failed to take precautions to prevent sparks or hot slag from reaching combustible material and if you further find that as a result of such negligent failure, if you so find, said defendant negligently caused or permitted sparks or hot slag to reach combustible material and that as a direct result of such negligence if you so find plaintiff's building was destroyed by fire * * *."

Plaintiff has failed to point out any manner wherein a submission of that vital issue under Count I would have been more advantageous to it than the foregoing submission under Count II. We have been unable to find that plaintiff suffered any

disadvantage by being deprived of a submission under Count I. We accordingly rule that under the facts, pleadings, and circumstances of this case no prejudicial error resulted from the action of the court in directing a verdict for Belger upon the first count of plaintiff's petition.

It is also contended by plaintiff that the court erred in refusing to admit evidence that Belger carried liability insurance against property damage. In a conference with the attorneys prior to the commencement of the trial the court ruled that paragraph 8 of the contract between plaintiff and Eisberg, and the certificate of insurance furnished by Belger, and other evidence concerning Belger's insurance could not be read or testified to before the jury. It was the court's view that such proof was not essential to plaintiff's case under Count I and that it would greatly prejudice Belger in connection with Count II to show that its liability, if any, thereunder was covered by liability insurance. Plaintiff took the position that the evidence was admissible in support of Count I and it therefore should not have been excluded merely because it might have been prejudicial to Belger on Count II.

In the situation under which we now review this case we need not determine whether or not the trial court ruled correctly. We have heretofore ruled that plaintiff was not prejudiced by the direction of a verdict on Count I because the jury had found adversely to plaintiff upon the essential issue as to whether the fire resulted from the acts or omissions of Belger's employees. It is obvious that the excluded evidence would not have been material to and would not have supported plaintiff's case upon that issue. Since a verdict for Belger was directed on Count I, and since the admission of the evidence in question would not have caused any different result, we are of the opinion that, in any event, plaintiff was not prejudiced by the exclusion thereof.

█ Appellant Eisberg contends that the trial court erred in directing a verdict in

favor of Belger on Count II of his cross claim. In that count Eisberg sought a judgment against Belger for any amount adjudged against Eisberg upon plaintiff's claim. Since the verdict of the jury on plaintiff's claim was in favor of both defendants, and no amount was adjudged in favor of plaintiff and against Eisberg, it would appear that Eisberg is in no position to complain unless the judgment in this case is reversed and remanded for a new trial. Since we affirm the judgment we need not decide that point. Eisberg has suggested that the action of the court in directing said verdict was prejudicial to him in connection with the submission of his claim against Belger for the loss of the machinery and pipes he had purchased. He points out that under the instructions any finding for plaintiff had to be against both defendants and hence the jury could not have consistently found in his favor on his cross claim without finding against him on plaintiff's claim. It is true that the essential issue in both submissions was whether the fire resulted from the negligent acts or omissions of Belger's employees. However, it may not be assumed that the failure of the court to submit Belger's liability to Eisberg under Count II of the cross claim would enter into the jury's findings upon the fact issue submitted in the instructions mentioned. It must be assumed that the jury found the issues in accordance with the evidence and not upon a consideration of the effect of their findings upon the parties. The contention is ruled adversely to defendant Eisberg.

Both of the appellants have briefed the point that the court erred in admitting evidence that unauthorized persons described as "bums and gandies" had been seen in and around the plaintiff's building. The court limited the proof concerning the presence of such persons inside the building to a period of three weeks prior to the fire. Evidence was admitted showing their presence around the building and in the shed near the northwest corner of the building for a longer period of time. Appellants say that

all of that evidence was inadmissible because it "was too remote and no causal connection between such evidence and the fire was or could be shown or inferred therefrom." In support of their contention appellants have cited the following cases: Bates v. Brown Shoe Co., 342 Mo. 411, 116 S.W.2d 31; Brawley v. Esterly, Mo.Sup., 267 S.W.2d 655; Hogue v. Wurdack, Mo. App., 298 S.W.2d 492; and Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S. W.2d 125. Each of the cases cited deals with the question as to whether the party having the burden of proof had offered sufficient circumstantial evidence to make a submissible case. They do not support the instant contention.

■ In the case at bar plaintiff had the burden of making prima facie proof that the fire resulted from the acts or omissions of Belger employees. It endeavored to carry that burden by evidence of a circumstantial nature. Defendant Belger was not required to offer any evidence to support a verdict for it. Conley v. Crown Coach Co., 348 Mo. 1243, 159 S.W.2d 281. However, Belger chose to defend the essential issue involved by offering evidence tending to prove that its employees were not negligent in their conduct of the dismantling operation and also offered circumstantial evidence tending to prove that the fire resulted (or, at least, *could have* resulted) from the acts of trespassers upon the premises. Proof that the fire resulted from the act of some one else would, under the circumstances of this case, exonerate Belger from liability therefor.

■ We have concluded that the evidence in question was admissible. To be admissible it was sufficient to show that it was not too remote and was logically relevant to the issue. It was not necessary for the evidence to be of sufficient substantiality that it might be described as "submissible." We have heretofore said that "the admissibility of circumstantial evidence does not depend upon its sufficiency as standing alone to take the case to the jury.

Admissibility and sufficiency are separate and distinct." Look v. French, 346 Mo. 972, 144 S.W.2d 128, 131. It is also well established that the "trial court usually has considerable discretion, and a wide latitude is allowed, in the admission of circumstantial evidence, especially when direct evidence is lacking." Herrman v. Daffin, Mo. App., 302 S.W.2d 313, 322. Appellants say that the evidence is too remote because there was no showing that "gandies" were present on the day of the fire. We do not agree. Since there was evidence that they were in the building every day for three weeks prior to the fire it would certainly be a reasonable inference from that proof that they were present on the day the building burned. We also think that evidence tending to show that these "gandies" drank wine and whiskey on the premises and built fires in the main building and in the nearby shed was logically relevant on the issue as to whether the fire was caused by the conduct of those trespassers.

We also mention another ground for the admission of that evidence. While the issue is not before us upon this appeal the question as to the value of the building was a vigorously contested issue in the trial. Evidence that it was located in an area habitually frequented by large numbers of "bums and gandies" would be material as a circumstance bearing upon the value of the building.

■ The next contention of plaintiff is that the court erred in excluding certain expert testimony offered by it. This point relates to the testimony of three witnesses. We will not extend this opinion by discussing certain of the instances wherein objections to answers were sustained and no offer of proof thereafter made, as such alleged errors are not before us for review. We will first consider the testimony of J. O. Winfrey, Chief of the Fire Prevention Division of the Kansas City Fire Department. This witness identified a book entitled "Handbook of Fire Protection" (author not stated) and the court sustained an objection to plaintiff's offer to read certain portions

thereof relating to the use of acetylene torches. We think the court ruled correctly. While books may be used upon cross-examination in order to test the knowledge of an expert, they are generally inadmissible as evidence of facts stated therein. This for the reason that such books are hearsay evidence of matters concerning which living witnesses could be called to testify. See 32 C.J.S. Evidence § 718, p. 627, and 20 Am.Jur., Evidence, Section 964, p. 812.

Plaintiff also asked Chief Winfrey the following question: "Q. I will ask you to state whether or not in your opinion if hot metal slag or sparks or molten fragments from a cutting torch were lodged in combustible material, such as wood or mill shavings, those fragments could start smoldering and continue to smolder for a period of as much as four hours without visible fire and then burst into flame thereafter?" The trial court sustained an objection to that question and in so doing (out of the hearing of the jury) expressed the view that expert testimony was not required upon that subject; that the matter sought to be proved would be known by the jurors from their observation and experience. Plaintiff contends that said ruling was erroneous. In connection with this assignment it should be noted that the question propounded to Chief Winfrey was rather general in nature and did not purport to hypothesize the conditions disclosed by the evidence in this case relating to the construction of the walls in the ice storage rooms and the manner in which the wood shavings were confined therein.

■ We have heretofore stated that "' * * * An expert witness, in a manner, discharges the functions of a juror; and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts proved. Expert witnesses are generally selected by the parties from their known opinions on the subject in respect to which they are called to

testify, and therefore, in view of the important functions they perform, their evidence should be admitted with great caution.'" Cole v. Empire District Electric Co., 331 Mo. 824, 55 S.W.2d 434, 438. It is also well established that the admission or exclusion of expert opinion testimony is a matter largely within the discretion of the trial court and the exercise of that discretion will not be interfered with unless it plainly appears that such has been abused. Capra v. Phillips Investment Co., Mo.Sup., 302 S.W. 2d 924; Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co., 237 Mo.App. 511, 175 S.W.2d 930.

■ We have concluded that the trial court did not abuse its discretion in excluding the testimony in question. Fire has probably been known to man throughout the period that the human race has existed and all adults have considerable knowledge upon the subject. It is a matter of common knowledge that a fire may be started in combustible materials that are compressed or moist and that it will smolder for as long as several hours and then burst into a flame. The evidence in this case showed in detail the manner in which the walls in the ice storage rooms had been constructed and the fact that fragments of molten metal would fly from the cutting operations for a considerable distance. The jurors were qualified by personal knowledge and experience to determine the issues relating to the source of the fire without the aid of the proffered expert testimony under consideration.

Our ruling upon the contention last considered will dispose of a similar point raised in connection with the testimony of Vernon Hunt, an expert witness upon the subject of oxygen-acetylene torches and the use thereof.

Plaintiff offered the deposition of Fire Chief Hillson. He testified that shortly after his arrival fire was discovered in the daily storage room and also in the far northwest part of the building. At the trial the court sustained an objection to the fol-

lowing answer and ordered it stricken: "Q. And went in, through that door? A. That is where the fire started, in that area." We think plaintiff's contention that the court erred in so ruling is without merit. The answer was not responsive to the question and was a conclusion of the witness.

■ There was some indication in the testimony of Chief Hillson that at some time after it was thought that the fire had been extinguished it again erupted and that such occurred in the wood shavings that had become packed in the basement of the building. In that connection it is contended by plaintiff that the court erred in excluding the following testimony of the witness: "Q. I am referring to the materials that you saw there, and my question was, is it characteristic of—from your experience of 21 years in the fire department, that materials of the kind you saw there which have burned, and even though the fire may be apparently extinguished, that fire may still smolder in those materials and erupt at a later date? A. Yes, if the material isn't turned over and wet down." Plaintiff has not pointed out the theory upon which it contends that testimony was admissible, but we may assume that it was offered to offset the effect of testimony that Belger's men threw water upon the walls in the storage rooms at the end of the day's work, and to provide the jury with a basis for finding that any smoldering fire that may have been inside the wall, which had not been put out by water that may have entered through cracks therein, would have continued to smolder for some time until it erupted into the flame that started the fire. The proof plaintiff sought to make related to a subject with which the jury was as familiar as the expert. The proffered testimony of the expert relates to a matter of common knowledge. Moreover, the circumstances existing in the two instances are shown to be quite different. We accordingly rule that the exclusion of the instant testimony was not reversible error.

■ Each of the appellants complain of error in the giving of Instruction No. 11

which reads as follows: "The court instructs the jury that *the mere fact the plaintiff's building was destroyed by fire at the time and place mentioned in the evidence is, in itself, insufficient proof of any negligence on the part of defendant, Belger Cartage, and would not, of itself, justify you in rendering a verdict in plaintiff's favor on Count II of its petition in this case, or in defendant Eisberg's favor on Count IV of his cross claim against defendant Belger Cartage,* but, on the contrary, plaintiff and defendant Eisberg must, by their evidence, and all of the facts and circumstances shown in evidence, prove that defendant Belger Cartage was guilty of negligent acts or omissions, and further, that such negligent acts or omissions, if any, were the direct and proximate cause of the fire which destroyed plaintiff's building, before plaintiff can recover on Count II of its petition, and before defendant Eisberg may recover on Count IV of his cross claim against defendant Belger Cartage." (Emphasis added.)

The first contention is that the italicized portion of the instruction "completely withdrew from the jury's consideration a vital and important circumstance in a circumstantial evidence case." Appellants rely on cases such as Citizens Bank of Festus v. Missouri Natural Gas Co., Mo.Sup., 314 S.W.2d 709, 72 A.L.R.2d 855; Dill v. Dallas County Farmers' Exchange No. 177, Mo. Sup., 267 S.W.2d 677, and Rittershouse v. City of Springfield, Mo.Sup., 319 S.W.2d 518. As an example of the type of instruction involved in those cases, we quote the following portion of the one considered in the Citizens case: "The Court instructs the jury that the mere fact of itself that there was a fire in the premises owned by the plaintiff and that plaintiff has brought suit, claiming that the fire was the result of negligence on the part of the defendant, is no evidence whatever that defendant was in fact negligent." 314 S.W.2d loc. cit. 714. In holding that instruction to be clearly erroneous we said: "It is just not true that the fact that there was a

fire in the premises owned by plaintiff '*is no evidence whatever* that defendant was in fact negligent.' The fact that there was a fire on plaintiff's premises and particularly a fire in the room where the furnace was located was an important circumstance to be considered in this circumstantial evidence case." 314 S.W.2d loc. cit. 714.

It is apparent, however, that the instruction in the Citizens case is quite different from the one before us. In Citizens the instruction withdrew from the consideration of the jury a fact which could properly be considered in a circumstantial evidence case. Instruction No. 11 in the case at bar did not withdraw anything from the consideration of the jury. The jury could fully consider the fact that plaintiff's building was destroyed by fire but was simply told that that fact, *in itself*, was not sufficient proof of negligence to justify a verdict against defendant Belger. The portion of the instruction complained of was a correct statement of law and we are unable to see wherein the jury would have been confused or misled thereby. In that connection we note that the exact instruction (except for necessary descriptive changes) was held not to be erroneous in the case of Jones v. Kansas City, Mo.Sup., 243 S.W.2d 318. We rule this point adversely to appellants.

 Appellants also make several contentions of error in regard to the portion of Instruction No. 11 reading as follows: "* * * on the contrary, plaintiff and defendant Eisberg must, by their evidence, and all of the facts and circumstances shown in evidence, prove that defendant Belger Cartage was guilty of negligent acts or omissions. * * *" It is first said that said provision eliminates from the jury's consideration all evidence favorable to plaintiff and Eisberg which was included in evidence presented by Belger. We see no such limitation in the general phrase, "all of the facts and circumstances shown in evidence," and we do not think the jury would so construe it. Next, it is contended

that the phrase, "by *their* evidence," is erroneous because plaintiff and Eisberg were adverse parties and did not jointly present any evidence and hence there was no evidence in the case which could correctly be described as "their" evidence. We do not think the jury would construe that phrase in that manner. Reasonably construed, we believe that phrase would be considered as referring to the evidence of both plaintiff and Eisberg. Certainly, when it is considered in connection with the provision immediately following, i. e., "and all of the facts and circumstances shown in evidence," the phrase in question did not constitute reversible error. The final complaint concerning the portion of the instruction now under consideration is that it amounted to a burden of proof instruction and, as such, was erroneous because it omitted the provision, "by a preponderance of the evidence." Plaintiff says that the omission of that phrase resulted in a requirement that it prove Belger's negligence by "all the evidence" instead of by a "preponderance of the evidence." Instruction No. 11 was not a burden of proof instruction but was a cautionary instruction relating primarily to one fact in the case. The court gave Instruction No. 4 which described plaintiff's burden of proof and contained the provision that plaintiff had the burden of proving its case "by the preponderance of all the evidence in the case." The two instructions were not in conflict and should be construed together. When so construed the requirement relating to "preponderance" was properly before the jury and it was not error to omit that phrase in Instruction No. 11.

 It is also contended that the court erred in giving cautionary Instruction No. 9. The portion thereof specifically criticized reads as follows: "You are not permitted to base a verdict on mere surmise, guesswork and speculation; and if upon the whole evidence in the case, fairly considered, you are not able to make a finding that acts or omissions, if any, of defend-

ant Belger Cartage directly and proximately caused the fire in question without resorting to surmise, guesswork and speculation outside of and beyond the scope of the evidence, and the reasonable inferences deducible therefrom * * *." At the outset of our consideration of that instruction it should be observed that the primary admonition therein must be said to be true. No one could reasonably contend that a jury should be permitted to base a verdict upon "surmise, guesswork and speculation outside of and beyond the scope of the evidence, and the reasonable inferences deducible therefrom." However, notwithstanding the truth of the abstract proposition contained therein, this court has criticized the giving of similar instructions in a number of res ipsa loquitur and circumstantial evidence cases. It should be noted, however, that no judgment has been reversed because of the giving of such an instruction by the trial court.

We see no necessity for extending this opinion by the citation and discussion of the cases involving questions of error in instructions similar to the one under review. This for the reason that in the recent case of McCormack v. St. Louis Public Service Co., Mo., 337 S.W.2d 918, the question here presented was carefully re-examined and many of the cases involving instructions such as the one before us were cited and discussed. We think the McCormack case is controlling here. In that case we held that an instruction essentially the same as the instant one was not reversibly erroneous. Therein we concluded that "the instruction is not as a matter of law erroneous and, therefore, unless it is reasonably demonstrable upon the present record that the instruction was misleading or in some other way deprived plaintiff of a fair trial, the giving thereof did not constitute reversible error." The briefs do not demonstrate, nor does the record indicate, that the jury was misled, or that either plaintiff or Eisberg were deprived of a fair trial by reason of the instruction in question. We accordingly rule that the

giving of Instruction No. 9 did not constitute reversible error.

Plaintiff contends that the court erred in giving Instruction No. 4 and Eisberg makes the same contention in regard to Instruction No. 7. These instructions are identical in all material respects except that No. 4 applies to plaintiff while No. 7 is applicable to defendant Eisberg. We will confine our discussion to Instruction No. 4 but our ruling thereon will dispose of the contentions of Eisberg concerning the other instruction. The instruction under consideration reads as follows: "The court instructs the jury that the burden is upon the plaintiff, Superior Ice and Coal Company, to prove by the preponderance of all the evidence in the case, every fact, which, under the instructions of the court, it is required to prove in order to make out a case against Belger Cartage on Count II of its petition, and if the jury believes that the evidence as to any one of such facts is in favor of the defendant Belger Cartage, or even if you believe the evidence as to any one of such facts is equally balanced between the plaintiff Superior Ice and Coal Company, and the defendant Belger Cartage, then the plaintiff has failed to make a case and it is the duty of the jury to find a verdict in favor of the defendant Belger Cartage upon Count II of plaintiff's petition." It is plaintiff's contention that the instruction is erroneous because it did not tell the jury that it could find the facts plaintiff was required to prove by drawing reasonable inferences from circumstantial evidence properly before it.

It is conceded by plaintiff that similar instructions were held not to be erroneous in Jewell v. Arnett, Mo.Sup., 318 S.W.2d 277, Palmer v. Lasswell, Mo.Sup., 287 S.W.2d 822, and Cornwell v. Highway Motor Freight Line, 348 Mo. 19, 152 S.W.2d 10. We notice similar rulings on similar instructions in Nelson v. Wabash R. Co., Mo. App., 194 S.W.2d 726, and Adams v. City of St. Joseph, 360 Mo. 806, 230 S.W.2d 862. But plaintiff says the Palmer, Cornwell, and Jewell cases "were relatively simple auto-

mobile collision cases with all issues being pleaded affirmatively and all facts shown by direct testimony." In that connection we note that the quoted statement is not entirely correct as the Jewell case involved a res ipsa loquitur submission.

■■ Various reasons have been advanced in support of the contentions of error in regard to the instructions in the foregoing cases. The precise reason suggested in the case at bar was not discussed in any of those cases. However, we do not think the instruction was reversibly erroneous for the reason plaintiff assigns. In an instruction of that nature there would seem to be no burden on Belger, in drafting the instruction, to tell the jury the type of evidence it could consider in determining whether plaintiff had proved its case. If plaintiff desired an instruction on the fact that the jury could draw reasonable inferences from circumstantial evidence it was its privilege and duty to offer one. Not having done so it is in no position to complain. However, our ruling in this regard should not be construed as a general approval of the instant instruction. We agree with the admonition given in the Jewell case to the effect that this is not a particularly suitable form of burden of proof instruction. The better practice is to give "a short, simple instruction advising a jury that a plaintiff has the burden of proving his case by a preponderance, that is, the greater weight of the credible evidence." Ledkins v. Missouri-Kansas-Texas Railroad Company, Mo.Sup., 316 S.W.2d 564, 569.

The judgment is affirmed.

COIL, C., concurs in result; HOUSER, C., concurs.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur except HYDE, J., who concurs in result and files concurring opinion of COIL, C. as his concurring opinion.

HYDE, Judge (concurring).

I concur in the result herein and the rulings herein other than the ruling made on refusing to admit expert testimony on the issue pointed out in the concurring memorandum of Coil, C., which I adopt as my Concurring Opinion herein and which is as follows:

"I have concurred in result in the above-styled case because I cannot go along with the manner in which Judge Holman has disposed of a point relating to the admissibility of an expert opinion.

"Pages 13, 14, and 15 of the typwritten opinion [at pages 905, 906 of 337 S.W.2d] show that plaintiff offered as an expert witness J. O. Winfrey, chief of the Fire Prevention Division of the Kansas City Fire Department. While the opinion does not disclose, I am quite certain that the record shows that Chief Winfrey was a qualified witness concerning the subjects about which he was questioned. He was asked whether hot metal slag or sparks or molten fragments resulting from the use of a cutting torch when lodged in combustible material, such as wood or mill shavings, could continue to smolder for as much as four hours without visible fire and then burst into flame. The trial court sustained an objection to the question for the stated reason that the matter was not a proper subject for expert testimony because the jury needed no assistance in determining the correct answer to the question.

"Judge Holman decides that the court did not err in sustaining the objection. I have difficulty in determining the exact reason for the holding. On page 14 [on page 906 of 337 S.W.2d] there are some general observations concerning expert testimony, including the proposition that its admission or exclusion is largely within the

discretion of the trial court, and the stated conclusion that the trial court did not abuse its discretion in excluding the testimony in question; but the opinion then proceeds to hold that it is a matter of common knowledge that a fire may be started in combustible material and smolder for as long as several hours and then burst into flame, and therefore that 'The jurors were qualified by personal knowledge and experience to determine the issues relating to the source of the fire without the aid of the proffered expert testimony under consideration.' I must assume, therefore, that the aforequoted statement is the actual reason for the holding that the trial court did not err in excluding the testimony and, if so, it would seem that the matter of discretion is not involved.

"In any event, it seems to me that while it is certainly true that it is a matter of common knowledge that a fire may be started in combustible materials and smolder for a long time and then burst into flame, such fact does not decide the question presented. That is because, irrespective of the fact that people know generally that fire may smolder and then burst into flame, the jury in this case was entitled to know whether the sparks in this case, if lodged in the particular combustible material in question, could smolder for as much as *four hours without visible fire* and then burst into flame. It was plaintiff's evidentiary trial theory that sparks from a cutting torch lodged in the material in the walls of the building in question and there smoldered *four hours* and thereafter burst into flame. *Plaintiff was entitled to prove by expert testimony the scientific possibility of his theory under the particular facts in evidence.*

"I think it would have been better for the trial court to have admitted the opinion, even in answer to the question as asked. However, I concur in result because the question as asked was improper in that it did not sufficiently hypothesize the conditions disclosed by the evidence which might have affected an answer to the question;

conditions such as the construction of a wall in which the combustible material was located, the manner in which the wood or mill shavings were contained within the wall, etc. My objection to the opinion is that it gives the wrong reason for holding that the trial court did not err in sustaining the objection."